Gerald F. ADLER, ·Plaintiff-Appellee,

v.

AMERICAN STANDARD CORPORA-
TION, Defendant-Appellant.

Gerald F. ADLER, Plaintiff-Appellant,

v.

AMERICAN STANDARD CORPORA-
TION, Defendant-Appellee.

Nos. 86–1614(L), 86–1633.

United States Court of Appeals,
Fourth Circuit.

Argued April 9, 1987.

Decided Oct. 13, 1987.
Rehearing and Rehearing En Banc
Denied Nov. 19, 1987.

Sidney Gordon Leech, Harley Thomas Howell (Anthony W. Kraus, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for defendant-appellant.

J. Owen Zurhellen, III, New York City (Stephen D. Langhoff, Doyle & Langhoff, Baltimore, Md., on brief), for plaintiff-appellee.

Before PHILLIPS and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

CHAPMAN, Circuit Judge:

The appellee Gerald F. Adler was terminated from his employment with the appellant American Standard, Inc.,[1] because the appellee had stated his intention to reveal to higher officers of the corporation the existence of an allegedly illegal "kickback" scheme. Although Maryland, where this case arises, adheres to the common law rule that unwritten employment contracts create employment "at will," the Court of Appeals of Maryland has recognized an

---

1. It appears that American Standard, Inc., has been improperly designated "American Stan-dard Corporation" in this litigation.

exception to this doctrine, and permits a claim for abusive discharge when the employee is terminated for reasons which contravene a clear expression of Maryland's public policy. We hold that an employment termination motivated by a desire to conceal wrongdoing by preventing its disclosure to higher corporate officers does not violate Maryland's public policy. We thus reverse the decision of the district court.

### I.

Adler was hired in 1975 by American Standard to work as an assistant general manager in the commercial printing division of the graphic arts group. The graphic arts group and commercial printing division were headquartered in Hunt Valley, Maryland. Adler's immediate supervisors were Mr. Kenealy, general manager of the division, and Mr. Sinclair, head of the graphic arts group. It appears that the personal and working relationship between Adler and Kenealy was very poor, resulting chiefly from disagreements pertaining to the operation of the business. Despite these problems, Adler received superior job ratings and promotions.

In January 1978, Adler was appointed acting president of Twin City Press in New Jersey, one of the companies within the printing division. In August 1978, Adler was appointed chief executive of Stern-Majestic in Pennsylvania, another printing company within the commercial printing division, and at this time his temporary assignment as president of Twin City Press was made permanent. At Stern-Majestic, Adler replaced Bernard Greene, the company's president, whose employment contract was about to expire.

Shortly after assuming control at Stern-Majestic, Adler was required to project the coming year's sales and profits. During a meeting with Stern-Majestic's comptroller, Adler was informed that the account of one customer, Vos & White, which account was handled personally by Greene, was a "payoff" account: business was acquired by use of kickbacks. As a result of this disclosure, Adler decided not to include the Vos & White account in the projection.

Soon thereafter, an employee of Stern-Majestic told Adler that Greene had engaged in the alteration of business documents relating to another customer, the Franklin Mint. Greene had apparently performed these alterations when the news had broken in 1976 that the Franklin Mint employee in charge of purchasing printing services had been indicted for receiving commercial bribes. Adler advised both Kenealy and Sinclair that the Vos & White and Franklin Mint accounts would not be included in the projections because those accounts were kickback accounts and because Greene was leaving the firm. Kenealy and Sinclair resisted Adler's efforts to alter the projections.

In early October 1978, Adler told Kenealy that he planned to discuss these problems at Stern-Majestic with company headquarters officials at the "Operations Review Meeting" on October 13. Kenealy, on October 4 or 5, met with Sinclair and they decided to terminate Adler. On October 12, the day preceding the Operations Review Meeting, Adler was fired. Shortly thereafter Adler received a letter dated October 12, advising him of his discharge for "unsatisfactory performance" stemming from Adler's recurring disagreements with his superiors, particularly concerning the projections. A copy of the letter was sent to four headquarters officials. Following Adler's discharge, Greene was retained as head of Stern-Majestic, and Stern-Majestic continued to do business with Vos & White and the Franklin Mint.

After Adler's lawyer had written to American Standard headquarters, officials of the company requested a meeting with Adler to discuss his assertions concerning the reasons for his discharge. When the company officials, after meeting with Adler, notified Kenealy and Sinclair of Adler's assertions, Kenealy admitted that he had been told months before about payoffs at Stern-Majestic, but testified that he had dismissed the assertions and had forgotten about the matter. The company began an internal audit and notified the Federal Bureau of Investigation. Eventually, Greene pleaded guilty to what the appellant terms "unspecified charges," and what the appellee claims to have been

charges of "mail fraud," arising out of the Vos & White kickback scheme. Kenealy was asked to resign.

Adler brought an action in New York district court against American Standard for abusive discharge, alleging that he had been discharged by his supervisors to prevent his disclosure of commercial bribery and alteration of records. The case was transferred to the District of Maryland,[2] and Adler amended his complaint to invoke Maryland law as the basis of his claim. Adler's amended complaint alleged that he intended to disclose the following "improper and possibly illegal practices": Attempts to treat capital expenditures as expenses; payment of commercial bribes; falsification of corporate sales and income data and alteration of commercial documents to support the falsified information; misuse of corporate funds by officers for their personal benefit; manipulation of work-in-progress inventory information; and alteration of forecasts in connection with intracorporate financial reporting. The district court then certified to the Court of Appeals of Maryland two questions: (1) whether Maryland recognized a cause of action for abusive discharge, and (2) whether Adler's allegations were sufficient to state a claim.

The Maryland court, in *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), held that a claim for abusive discharge would be permitted in Maryland, a state which deems unwritten employment contracts to create at will employment, "when the motivation for the discharge contravenes some clear mandate of public policy." *Id.* at 47, 432 A.2d at 473. On the second question, the court held that although Adler had alleged that commercial bribery is in violation of a criminal statute[3] and the other practices he intended to disclose are so clearly against public policy that no specific statute or rule of law need be identified, that Adler's reliance on the criminal statute was misplaced, and the averments in the complaint, together with all reasonable inferences to be drawn

therefrom, failed to state a cause of action for abusive discharge.

Adler then filed a second amended complaint, claiming that he had been discharged to prevent his disclosure to management of the violation of seventeen federal and Maryland statutes. Holding that any alleged statutory violation might state a claim, the district court denied a motion to dismiss. *Adler v. American Standard Corp.*, 538 F.Supp. 572, 579 (D.Md.1982).

On the eve of trial, Adler notified defense counsel that he also intended to prove that he was terminated to conceal violations of the federal mail fraud statute and the Maryland theft statute.[4]

At the close of evidence, the district judge ruled that Adler had failed to prove any violation of the seventeen statutes cited in his pleadings. He instructed the jury to find for Adler if it determined that his discharge was motivated by a desire to prevent his disclosure of illegal activities involving the Vos & White and/or the Franklin Mint accounts at Stern-Majestic. The jury awarded Adler $1,232,000 in compensatory damages and $1,000,000 in punitive damages on his claim for abusive discharge. Adler had also brought a claim for defamation based upon the letter sent by his supervisors to corporate officials which attributed Adler's discharge to unsatisfactory performance. On this claim, the jury returned a verdict of $70,000 in compensatory damages and $500,000 in punitive damages. The district court granted a judgment notwithstanding the verdict on the defamation claim in its entirety. The district court also granted judgment notwithstanding the verdict on the punitive damages award in the abusive discharge action.

## II.

■ The common law rule, followed in Maryland, is that "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of

2. *Adler v. American Standard Corp.*, 478 F.Supp. 8 (S.D.N.Y.1979).

3. Md.Ann.Code art. 27, § 174 (1957, 1976 repl. vol.).

4. Md.Ann.Code, art. 27, §§ 340–344.

either party at any time." *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464, 467 (1981). Despite this common law rule, the Court in *Adler* held that there was a cause of action for abusive discharge where

> an at will employee's interests in job security, particularly when continued employment is threatened not by genuine dissatisfaction with job performance but because the employee has refused to act in an unlawful manner or attempted to perform a statutorily prescribed duty, is deserving of recognition. Equally to be considered is that the employer has an important interest in being able to discharge an at will employee whenever it would be beneficial to his business. Finally, society as a whole has an interest in ensuring that its laws and important public policies are not contravened. Any modification of the at will rule must take into account all these interests.
>
> As we have indicated, few courts have flatly rejected the notion that the wrongful discharge of an at will employee may give rise to a cause of action for damages. Where courts differ is in determining where the line is to be drawn that separates a wrongful from a legally permissible discharge. This determination depends in large part on whether the public policy allegedly violated is sufficiently clear to provide the basis for a tort or contract action for wrongful discharge.

*Id.* at 42, 432 A.2d at 470–71.

In Adler's Second Amended Complaint, which was filed after the Court of Appeals of Maryland had answered the certified questions, he again alleged that he was wrongfully discharged because he was going to report to superior corporate officers the wrongful acts of certain of his supervisors. He alleged that he was terminated by a letter giving as a reason "unsatisfactory performance." He then alleged:

> The reason given in the termination letter for plaintiff's discharge was specious. In fact, Kenealy and Sinclair discharged plaintiff in order that the various illegal and improper activities mentioned above, and their condonation for (sic) implication in such activities would not be disclosed,

in order that their employment would not be jeopardized, in order that they might avoid sanctions for their conduct and in order that such activities might continue to be perpetrated free from direction and interference. Accordingly, plaintiff's termination was a wrongful discharge in violation of public policy.

There was no allegation, claim or testimony that Adler threatened to report such activities to law enforcement agencies or to anyone outside the corporate group.

In his charge the judge instructed the jury:

> As a judge in this case, it is my function to decide what Maryland's public policy is. And I advise you that I have found that it would be a violation of the public policy of this State, if Mr. Adler's discharge was motivated by a desire to prevent disclosure of illegal activities involving the Vos-White and/or the Franklin Mint accounts at Stern-Majestic.

We do not find that the Maryland Court of Appeals created such a broad exception to the "employment at will" doctrine in *Adler,* and we perceive no reason to read that proposition into Maryland public policy.

Courts must use care in creating new public policy. In *Adler* the Maryland court observed:

> We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch.

291 Md. at 45, 432 A.2d at 472 (citing *First Nat'l Bank v. Fidelity & Deposit Co.,* 283 Md. 228, 389 A.2d 359 (1978)). The Maryland court quotes with approval the following from *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854 (1930):

> The truth is that the theory of public policy embodies a degree of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as a basis of a judicial determi-

nation, if at all, *only with the utmost circumspection.* The public policy of one generation may not, under changed conditions, be the public policy of another. (emphasis added by the Maryland court).

*Adler,* 291 Md. at 46, 432 A.2d at 472.

Limitation of the claim for abusive discharge to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty, ties abusive discharge claims down to a manageable and clear standard. This analysis is consonant with the stated intention of the Maryland Court of Appeals in *Adler* to preserve the rights of the employer to terminate employees at will, subject only to the limited exceptions created by statute and to the relatively limited instances where a clear mandate of public policy has been violated. As a general prudential rule, legislatures have traditionally been reluctant to impose affirmative obligations on citizens to report or prevent crimes because defining what is a crime and to whose knowledge is a very difficult and intrusive inquiry. This reluctance imparts caution to this court.[5] In the absence of a clear declaration by a legislature or the Maryland Court of Appeals that an action for abusive discharge should be extended to situations where the discharged employee claims to have had the knowledge and the intent to report wrongdoing to a higher corporate official, this court should not create such a ruling. We find that the district court erred in determining that the plaintiff had properly stated and proved a cause of action for abusive discharge under Maryland law.

What Adler presented at his trial was little more than the allegations and the reasonable inferences to be drawn therefrom, that were presented to the Maryland Court and found insufficient to represent a violation of "some clear mandate of public policy." His allegations and his evidence reveal nothing more than his discharge resulting from his intention to "blow the whistle" on illegal activities condoned by his supervisors Kenealy and Sinclair and their efforts to protect themselves by discharging him. This is not a violation of clearly mandated Maryland public policy and it does not involve an effort by Adler to fulfill a statutorily prescribed duty nor his failure to engage in illegal activity.

In regard to the appellee's arguments on cross-appeal, we find that the district court was correct in granting a judgment notwithstanding the verdict on the defamation claim. The plaintiff simply failed to present any evidence that the recipients of the letter understood it to be defamatory: a necessary element for that claim. The motion to certify additional questions to the Court of Appeals of Maryland is denied.

AFFIRMED IN PART; REVERSED IN PART.

BUTZNER, Senior Circuit Judge, dissenting:

In its opinion recognizing a cause of action for abusive discharge the Court of Appeals of Maryland explained that an at-will employee would be protected under the following circumstances:

> [A]n at will employee's interest in job security, particularly when continued employment is threatened not by genuine dissatisfaction with job performance but because the employee has refused to act in an unlawful manner or attempted to perform a statutorily prescribed duty, is deserving of recognition.

*Adler v. American Standard Corp.,* 291 Md. 31, 42, 432 A.2d 464, 470 (1981). This illustration of the doctrine of abusive discharge applies to Adler's claim. In count 2 of his amended complaint he set forth in detail the violations of state and federal laws, including kickbacks, that he found upon assuming control of two of the company's subsidiaries. He then alleged:

> In August, September and early October 1978, after plaintiff assumed responsibilities as chief executive of TCP and S–M, he made it clear to Kenealy and

5. In *Pope v. State,* 284 Md. 309, 352, 396 A.2d 1054, 1078 (1979), the court noted:
   If the Legislature finds it advisable that the people be obligated under peril of criminal penalty to disclose knowledge of criminal acts, it is, or course, free to create an offense to that end, within constitutional limitations, and, hopefully, with adequate safeguards.

Sinclair that he would not participate in, permit or condone continuation of the improper and illegal activities relating to the business of those companies. His own reputation for honesty required that the activities be revealed to superior corporate officers. Kenealy and Sinclair became increasingly insecure and feared for their positions, in light of plaintiff's insistence that he would not permit or condone continuation of such practices and that they be disclosed.

Adler's testimony was consistent with his complaint. The evidence discloses that he told his immediate superiors, Kenealy and Sinclair, that, despite their insistence, he would not include in his profit projections any anticipated business from two kickback accounts. He testified: "There was no way that I was going to get any business because I wasn't going to pay for it." In short, the jury could find that Kenealy and Sinclair knew that Adler was not going to engage in the unlawful acts for which his predecessor was ultimately convicted.

To be sure Kenealy and Sinclair fired Adler on the eve of a meeting with officers from the parent company in order to silence him. But that should not be the end of the court's inquiry. The critical aspect of the case is the content of the disclosure Adler intended to make. The evidence is sufficient for the jury to find that Kenealy and Sinclair knew that Adler was not only going to reveal, as a whistle blower, past crimes committed by his predecessor. They knew also that he was going to announce that he would not engage in, permit, or condone similar crimes in the future.

It is Adler's refusal to commit unlawful acts that distinguishes this case from those where whistle blowers, who did no more than accuse other persons of derelictions, were not given protection. Indeed, when a whistle blower is also the person who must decide whether a course of illegal conduct will continue, implicit in his disclosure of the illegality to his superiors is his renunciation of its continuance in the absence of any express intention to the contrary.

I believe that the public policy of Maryland, which is so clearly explained in *Adler* *v. American Standard Corp.*, 291 Md. at 42, 432 A.2d at 470, does not tolerate the discharge of a person because he has refused to continue and intends to disclose the illegal activity of his predecessor. I dissent because, despite the jury's verdict in his favor, this sound public policy is not given effect in Adler's appeal. I would affirm the judgment of the district court.