**Carl J. MERCK, Plaintiff–Appellant,**

v.

**ADVANCED DRAINAGE SYSTEMS, INC., Defendant–Appellee.**

No. 89–2142.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1990.

Decided Dec. 26, 1990.

Stephen G. Morrison, argued (Kenneth E. Young and George K. Lyall on brief), Nelson, Mullins, Riley & Scarborough, Greenville, S.C., for plaintiff-appellant.

Steven Walter Tigges, Squire, Sanders & Dempsey, Columbus, Ohio, argued (William C. Cleveland, Haynsworth, Marion, McKay & Guerard, Charleston, S.C. on brief), for defendant-appellee.

Before RUSSELL and HALL, Circuit Judges, and GARBIS, United States District Judge for the District of Maryland, sitting by designation.

DONALD RUSSELL, Circuit Judge:

In this diversity case, controlled by South Carolina law, the plaintiff Carl J. Merck (Merck) appeals the granting of summary judgment in favor of his former employer, Advanced Drainage Systems, Inc. (ADS), in his suit in tort for an alleged illegal dis-

charge as vice-president for plant operations. He had been employed as such vice-president since 1985. His claim was stated in two counts. In the first count he alleged that he was constructively discharged on June 30, 1987, because he refused to "take part in defrauding state governments by certifying that ADS's products (plastic tubing used in highway drainage systems) were manufactured in compliance with the American Association of State Highway Officials (AASHTO) standards when in fact they were not."[1] This action of ADS, according to Merck, was a constructive discharge, in violation of the South Carolina rule proscribing discharge of an at-will employee in violation of a clear mandate of public policy. *Ludwick v. This Minute of Carolina, Inc.*, 287 S.C. 219, 337 S.E.2d 213 (1985). The public policy violation charged was a failure to comply in its manufacture with certain AASHTO specifications adopted by the South Carolina Highway Department. He added another count under the South Carolina Unfair Trade Practice Statute, S.C.Code § 39–5–140. He conceded, however, that recovery under this count depended on recovery under the first count. In response to this complaint, ADS answered by denying liability under this first count, stating that it had not defrauded state governments by using materials which failed to comply with AASHTO regulations, that Merck had never been required to and had never certified that ADS's production of highway piping had been manufactured in compliance with AASHTO's regulations and denying a violation of the State Fair Practice Act as charged in Merck's second count. Considerable discovery by both parties followed after this joinder of issues.

At the conclusion of the discovery, ADS moved for summary judgment and the district court granted the motion, finding that there had been no violation of a "clear mandate of public policy" as required under *Ludwick.* Merck has appealed. We affirm.

I.

ADS is said to be the leading producer of polyethylene plastic drainage tubing or piping in the United States. Its corporate headquarters are at Columbus, Ohio. It has 23 manufacturing plants spread across the United States. Its production is primarily piping for commercial and agricultural use, with, to a minor degree, manufacture for highway construction.[2] In its corporate structure, ADS has a number of separate divisions, with precise and well understood responsibilities. Each of such divisions was generally headed by a vice-president, who reported to Franklin Eck, the president of ADS. The two divisions most directly involved here were that of quality control and that of plant operations. The division of quality control was under the direct supervision of vice-president Rose, among whose subordinates were Brewton and Slicker. Merck testified without dispute that this division, along with the ADS laboratory located in Hamilton, Ohio, "prescribed the material that was to be run [in the plants]; they set the levels of materials to be run in each product; they were responsible for testing tubing; they were responsible for investigating and determining quality control that occurred at the plant or at the customer level."[3] Normally the responsibility for certifying that production complied with any applicable

1. Later, in response to an interrogatory of ADS, Merck stated as the basis for this cause of action that "[t]he defendant required plaintiff to either take part in defrauding state governments by certifying that defendant's products (plastic tubing used in highway drainage systems) were manufactured in compliance with the American Association of State Highway Officials (AASHTO) standards when in fact they had not, or resign his employment."

2. The division of ADS's construction, as testified by representatives of ADS, was 95% for com-

mercial and agricultural use and 5% for highway use. Merck gave an estimate that highway products represented 25% of ADS's production. We would assume that ADS's records were much more accurate than Merck's estimate. It is not, however, necessary to resolve this diversity of opinion on the volume of highway manufacture as that fact is not material to our decision here.

3. Appendix at p. 42, vol. 1.

regulations also rested on this division.[4] The vice-president for plant operations, the position Merck assumed in July 1985, had responsibility only for carrying out the directive for quality control with respect to "the prescribed materials to be run in each product and the limitations as to percentage;"[5] it, in Merck's words, specifically had no responsibility or duties in "prescribing the materials" to be used in the manufacturing process or "for setting those levels" on the amount of such use.

Although he had been employed by ADS since 1973 but always in plant operations, Merck did not become vice-president of plant operations until July 1985, following the retirement of John Hodges.[6] At the time ADS had been using spec resin and calcium in the manufacture of piping for highway use since 1981.[7] In May or June of 1986, Merck went directly to Eck, ADS's president, without first discussing the matter with quality control, and raised the question whether calcium carbonate could be used in the manufacture of highway piping under AASHTO M–252 specifica-

tions.[8] Eck's affidavit is unclear whether Merck raised at the same time the qualifications for use under the specifications of spec resin. Merck's testimony is that he did. In any event, Eck agreed to the elimination of calcium in the manufacturing process even though it later developed, as admitted by Merck and his expert witness, that calcium was probably usable under the specifications set forth in M–252. Merck testified that spec resin was discussed and that Eck said he would like to look further into the question whether spec resin was usable in the manufacture of highway tubing under the AASHTO specifications. Whether spec resins were discussed or not, Eck directed vice-president Meyer Stuhlmeyer to determine whether spec resin could properly be used in the manufacture of highway piping under AASHTO M–252. Eck explained his selection of Stuhlmeyer for this task because he "had [had] approximately 17 years of industry experience in working with ASTM and AASHTO specifications and related documents."

4. Appendix at p. 93, vol. 1.

5. Appendix at p. 43, vol. 1.

6. Eck, in his deposition, states that Merck's appointment was intended to be an interim appointment since Merck had already indicated an intention to retire in a year or so to a home he had purchased on Pawley's Island, South Carolina. Under these circumstances, Merck's offices were not fixed at the corporate offices in Columbus on Hodges' retirement but he was permitted to maintain his offices and to operate out of his home in Pawley's Island.

7. The defendant has given an account of its manufacturing process. In this explanation, ADS defined "spec resin" as reprocessed resin, used in the blending of 75% virgin resin and 25% reprocessed resin. The term "spec" refers to specifications and "spec resin" means resin meeting the specifications.

The manufacturing process for plastic polyethylene piping has as its basic material polyethylene resin in either pellet or powder form, color concentrate, carbon black and calcium carbonate as a filler to provide greater strength. These are mixed with various chemicals and lubricants and fed into an extrusion machine, where heat and pressure are applied to melt the mixture into a mold.

There are three types of resin: (1) "virgin" resin, which means it has not been previously used to make a product; (2) "reprocessed" resin

which had been previously used but had since been cleaned and repelletized; and (3) "reworked" material which is a regrind of a finished product which could not be used for various reasons. Originally, ADS used only virgin and reworked resin. In the late 70's ADS found, after experimentation, that, according to its tests as described by it, reprocessed resin blended in a proper proportion could produce piping equal in quality to products made solely from virgin resin. Such reprocessed resin was only used, according to ADS's explanation, if it was found after testing to meet the same physical and chemical specifications as virgin resin. If, after testing, the maker found that such reprocessed resin met the same tests of quality as virgin resin, then that resin was classified as "spec" resin.

8. The relevant parts of AASHTO M–252 (Section 5.1 and Section 5.2) are:

5.1 *Basic Materials*—Pipe and fittings shall be made of virgin PE compounds which conform with the requirements of Type III, Category "4" or "5", Grade P 33, Class C, or Grade P 34, Class C as defined and described in ASTM D 1248.

5.2 *Reworked Material*—Clean reworked material generated from the manufacturer's own production may be used by the manufacturer provided that the tubing or fittings produced meet all requirements of this specification.

Stuhlmeyer began his investigation promptly. He interviewed Merck—apparently because he had been told that the latter had raised the question he was investigating—and sought to review the matter with Merck. Merck, by his own account, indicated that his opinion was firm and, according to Stuhlmeyer, walked out of the meeting.[9] Stuhlmeyer proceeded with his investigation and in either late May or early June reported the results of his investigation to Eck. Stuhlmeyer's opinion, as submitted to Eck, was that AASHTO permitted the use of spec resin in highway piping. On the basis of this opinion, Eck instructed Slicker, the ADS products manager in quality control and product specifications to issue a memorandum to the plant managers directing that ADS spec resin be used in the manufacture of highway pipe. Slicker issued such memorandum on June 8, 1987. This was the proper manner for establishing the materials to be used in manufacturing by the plant operations. At the same time Eck directed the issuance of a memorandum on the corporation's purchasing policy for ADS spec resin. Such policy was stated thus:

It is the purchasing policy of ADS that all "ADS Spec Resin" purchased by ADS from various suppliers will contain properties consistent with those of virgin high density polyethylene (HDPE) purchased from major U.S. producers.

Therefore, the "ADS Spec Resin" used in the manufacture of corrugated polyethylene pipe and fittings will, as regards properties, comply with the requirements specified in Section 5 Basic Materials of AASHTO M252 Standard Specification for Corrugated Polyethylene Drainage Tubing and AASHTO M294 Standard Specification for Corrugated Polyethylene Pipe, 12″ to 24″ diameter, and as defined and described in ASTM D1248 Standard Specification for Polyethylene Plastic Molding and Extrusion Materials.

Before issuing the letter of June 8, Slicker, who had been requested by Merck to advise him of any directive for the use of spec resin, called Merck and told him, according to Merck's testimony, that "he'd been called in Mr. Eck's office and told to write a memorandum to the field directing that spec resin be put back in certified tubing." Immediately after receiving a copy of Slicker's memorandum, Merck testified he "called each plant manager and told them to put it [i.e., the directive] on hold. Do not implement." He also testified that he did not tell Eck that he had "countermanded" the directive issued at Eck's direction. He explained such failure because his "game plan was to do some spade work. First to get a game plan and to go back in and challenge Mr. Eck in my next visit to Columbus which was in July." He added: "My plan was very basically to gain two or three or four months and prove to his [sic] that we could run as much spec resin that they had programmed budget-wise to run and still be doing it properly." Appendix at p. 83, vol. 1.

Merck then undertook to enlist the other vice-presidents and plant managers in his "game plan." One of those Merck talked to in connection with his effort to enlist support for his "crusade"[10] reported to a Mr. Chalpty in quality control about Merck's countermanding Eck's directive. Chalpty threatened to report the matter to Eck. Seeking to protect himself against this danger, Merck telephoned Eck. In that conversation, Merck did not tell Eck that he had countermanded the latter's directive. It was, as Merck described it, "a

---

9. Merck's own testimony on this was:

I asked him [Stuhlmeyer] his purpose and, he said well, he had been commissioned to do this by Mr. Eck. And then I asked him what will you do. He said he was here to convince me. I said what will you do if you don't convince me. He said he would present it to Mr. Eck. I said fine. The one thing you won't convince me or I won't be convinced, unless you explain to me how you end up with virgin material out of reprocessed material.

Q. And what did Mr. Stuhlmeyer say?
A. I don't think there was much of a conversation after that.
Q. In fact, you wouldn't let him finish the conversation, would you?
A. Probably not.

10. Merck kept his file on spec resin in a file he maintained under the title "Crusade."

light conversation with him in which I said something to the effect that I was preparing some notes and that I would like to come up and discuss this spec resin matter with him on my next visit to Columbus, which was the first week in July." Eck agreed.

Merck proceeded to take a week's vacation the last of June, "most of it preparing for my talk with Mr. Eck." During this time, someone reported to Eck that Merck had countermanded Eck's directive. Eck attempted immediately to reach Merck. He was not able to do so until Monday, June 30. Eck asked Merck if he had countermanded Eck's order. According to Eck, Merck at first denied that he had but then admitted he had, saying, "So what if I did." Merck testified that Eck at this point told him "to call all your plant managers and revoke your order" by Wednesday at 5:00 p.m. Merck responded, "I don't want to do that or words to that effect." In response to that Eck said, "if you don't do this [and] report back to me by then, you'll be terminated." Merck replied that he had never been terminated in his life and that he "wasn't going to start now," so he resigned. This suit followed.

## II.

The district judge issued two opinions: one followed arguments on ADS's motion for summary judgment; the second was on Merck's motion to "alter or amend the judgment." Both opinions reached essentially the same result: Merck had failed to meet the standard of establishing a discharge violative of a clear mandate of public policy as required under *Ludwick.* We begin with his first opinion. The district judge began this opinion by finding in dispute whether the defendant had been constructively discharged and proceeded to consider whether Merck could establish that his alleged discharge contravened a clear mandate of public policy and thus was actionable in tort under *Ludwick* as Merck

contended in his first count. Merck cited to the court certain specific State Highway Specifications (Section 5.1 and Section 5.2 of M–252), the violation of which would under his argument involve various criminal statutes of South Carolina. He argued that under these circumstances a violation of the Highway Specifications would contravene the public policy of the state as required by *Ludwick.* ADS took the position that the Highway Specifications did not reflect the public policy of the state and, if they did, it had complied as it in good faith understood the specifications. The district judge found it unnecessary to resolve this issue and for purposes of decision "presumed that the relevant policy is reflected in the laws, rules, and regulations cited by the plaintiff." [11] He accordingly decided the case on the ground that Merck could not establish that his discharge violated a "clear mandate of public policy." In reaching this conclusion, he noted that Ralph Vogler, Merck's retained expert, had stated that the specification which Merck claimed had been violated by ADS "contained a number of ambiguities" and, therefore, could not satisfy the requirement of "a clear mandate" under *Ludwick.* He then identified some of the ambiguities:

From this testimony, it is evident that M–252 is susceptible of at least two reasonable interpretations. According to one view, highway pipe would have to be manufactured from virgin resin, or from reground, pelletized, or solvated highway pipe that had been previously generated by the manufacturer from virgin resin. Oppositely, the specification may be read such that "virgin" in § 5.1 modifies "compound" rather than "polyethylene". Thus, M–252 would require that the plastic compound be virgin in the sense that it had not previously been processed into a product such as highway pipe, and if the compound had been previously processed, then it could be reground, pelletized, or solvated for the manufacture of highway pipe only if it was clean materi-

---

11. Note 2 of his opinion is as follows:

While the court recognizes that statements of public policy may be manifested in forms other than legislative and quasi-legislative enactments, for purposes of this discussion it is presumed that the relevant policy is reflected in the laws, rules, and regulations cited by the plaintiff.

al generated from the manufacturer's own production. Since the policy contained in M–252 is not clear, the plaintiff cannot establish that his discharge violated a clear mandate of public policy, and so the wrongful discharge claim must be summarily dismissed.

The district judge granted ADS's motion for summary judgment because of this lack of clarity in the alleged specifications.

Merck sought a rehearing. At this rehearing, Merck, according to the court, did not dispute that a cause of action under *Ludwick* is only sustainable "to redress a termination that violates a clear mandate of public policy." His first argument on rehearing was that the court "instead of viewing Section 5.1 and Section 5.2 in tandem, ... should have looked solely to Section 5.2 to determine the existence of a clear statement of public policy." The district court dismissed this argument saying:

Section 5.2 states that "[c]lean reworked material generated from the manufacturer's own production may be used by the manufacturer provided that the tubing or fittings produced meet all requirements of this specification." The express language of § 5.2 is permissive; merely describing one type of plastic compound that may be used to forge highway pipe. Although this provision contains a clear statement in favor of allowing the use of reworked plastic from the manufacturer's own facilities in highway pipe, it does not state that reworked plastic is the exclusive material to be used, or otherwise prohibit the use of reprocessed resin. Hence, even considering § 5.2 in isolation, specification M–252 does not contain a clear statement of public policy against the defendant's activities.

(Footnote omitted.) Merck's second argument on rehearing was that:

[R]egardless of whether § 5.1 is interpreted to require the use of virgin polyethylene resin or virgin plastic compound, it clearly does not allow the use of reprocessed resin. Section 5.1 states that "[p]ipe and fittings shall be made of virgin PE [polyethylene] compounds...." In a related document, the term compound is defined as "a mixture of polymer with other ingredients such as fillers, stabilizers, catalysts, processing aids, lubricants, modifiers, pigments, or curing agents." According to the plaintiff's view, a compound may only be considered virgin within the terms of § 5.1 if each of the elements of that compound have never been previously subjected to a manufacturing process. Nevertheless, the provision itself is not so restrictively phrased. It may reasonably be interpreted to allow the use of recycled elements so long as the compound formed by the combination of those elements has never been previously subjected to use or processing.

The district court accordingly denied Merck's motion for reconsideration for altering the judgment. Since Merck agrees that his state action under the state Fair Practices Act depended upon recovery in the *Ludwick* count, the grant of summary judgment on the *Ludwick* count operated to dismiss also the Fair Practices count.

We are of the opinion that the decisions of the district court were correct and, therefore, affirm the judgment of that court herein.

■ We agree with the district judge both in his findings of facts and his conclusions of law. Specifically, we agree that although the *Ludwick* doctrine exists as an exception to the long established principle that an at-will employee may be terminated at will, it is, however, an exception that is to be very narrowly applied. The "public policy" violation requirement by the doctrine is not an open-ended concept but is restricted to violations which contravene the clear mandate of public policy "within the penal sphere." Such construction seems evident by the language of *Ludwick* that "[t]he public policy of South Carolina is manifestly reflected in the *penal* statute with which Ludwick was compelled to comply." 287 S.C. at 225, 337 S.E.2d 213 (emphasis added). And this was the construction given the *Ludwick* doctrine in *Miller v. Fairfield Communities, Inc.*, 299 S.C. 23, 382 S.E.2d 16, 19 (Ct.App.1989), a decision by the South Carolina Court of Ap-

peals, decided after the opinions in this case. The court said in that case: "From the discussion in *Ludwick* it seems clear the Supreme Court did not consider public policy outside the sphere of criminal sanctions." 382 S.E.2d at 19. That same view was substantially declared by us in our opinion reviewing a similar exception to the right to terminate an at-will employee under the analogous Maryland doctrine. We sustained the doctrine then limited as it was to discharge of an at-will employee for refusing "to engage in illegal activity or the intention to fulfill statutorily prescribed duties." *Adler v. American Standard Corp.*, 830 F.2d 1303, 1307 (4th Cir.1987). And Merck seems to accept this narrow concept of "public policy" under the doctrine, for he sought in his presentation to identify certain penal statutes which he alleged ADS had violated by not following strictly State Highway Department Specifications. The district judge, however, without accepting Merck's contention that a violation of highway specifications qualified as reflecting "the public policy" of the state, presumed for purposes of the decision that it did and then addressed whether the termination in this case had contravened "a *clear mandate* of public policy," a requirement that the South Carolina Supreme Court emphasized in its concluding paragraphs in *Ludwick:*

> Courts of other jurisdictions which recognize the exception also acknowledge the peril that an outpouring of vexatious and frivolous litigation may be spawned by modification of the doctrine. Beyond that is a common concern that the employer not be unduly fettered in exercising his rightful prerogative to select employees.
>
> In sharing these same concerns we emphasize that a cause of action for wrongful discharge of an at-will employee shall exist only where the alleged re-

taliatory discharge constitutes a clear violation of a mandate of public policy.

As we have already observed, the district judge in this case found that the highway specifications on which Merck relied for his cause of action did not satisfy this requirement of "a clear mandate of public policy." He therefore dismissed Merck's *Ludwick* cause of action and granted summary judgment in favor of ADS.

■ The evidence of both Merck and his retained expert witness Vogler fully support the conclusion of the district judge that Section 5.1 and Section 5.2 of M–252 (the two sections in issue, see note 8) were not clear and failed to satisfy the requirement of "a clear mandate of public policy." Vogler, for instance, conceded that "[t]here could be a degree of ambiguity there" in one of the key phrases in these sections. He also testified that "there were aspects of M–252 that could use some clarification" and that "if [he] were rewriting it, [he] would rewrite it in different words, *which hopefully would be clear*"—thereby conceding implicitly that the sections were not clear. (Emphasis added.) He admitted that he had to make assumptions, and, in some instances, assumption upon assumption in order to arrive at his interpretation of M–252.[12] At other points Vogler supported his interpretation of M–252 not by the language of the specification itself, giving it its normal definition, but by what he declared to be, in his opinion, the intent of the drafters of the specification. An instance of this form of reading his interpretation in the section by the expert witness is illustrated in his attempt to find in the specifications that "reworked material" permitted for use in highway piping under Section 5.2 had also to meet the requirements of Section 5.1 for virgin material. Asked to identify words in the specifications to that effect, Vogler testified:

> Q. And you're reading something into them at each of these levels, is that right?
> A. As I believe they were intended to be interpreted.
> Q. But you are reading something into them?
> A. Correct.

12. At one point in his testimony Vogler admitted he read something into the specification which was not stated therein. Thus, he testified:

> Q. So at each of these different levels that you've described, you're interpreting the documents?
> A. Correct.

A. Why, I don't see specific wording to that extent. That would be my presumption that it would apply.

Q. But the specific words aren't there?

A. Correct. What they meant by requirements is not defined.

Q. You have to engage in some level of the interpretation of the document to reach your conclusion?

A. Yes.

Another illustration of this lack of clarity relates to the permissible use of calcium carbonate in the highway piping manufacture under specification Section 5.1. In their initial testimony, both Merck and Vogler testified categorically that calcium carbonate was proscribed because it was not a "virgin" material. However, the language of Section 5.1 prescribes as a permissible material "virgin PE compounds." However, the AASHTO specifications have a glossary in which all critical terms are defined. In F–412 of this set of definitions, the term "compounds" is defined to include filler material which is what the calcium was and which by its very nature is not "virgin." Faced with this definition, both Merck and Vogler had to change their earlier construction of Section 5.1 as it related to calcium carbonate and both seemed to agree that calcium carbonate could be a permissible material under Section 5.1, claiming then that "virgin" only modified "PE" and not "compounds," though he admitted that a "reasonable person" could construe "virgin" as modifying "compounds" in the specification rather than PE.

It is unnecessary to prolong this opinion with other examples of confusion in the interpretation of Section 5.1 and Section 5.2. The instances described by the district judge in his two opinions and those stated in the above illustrations are more than sufficient to sustain the district judge's conclusions that the specifications in question did not represent "a clear mandate of public policy." He accordingly correctly granted summary judgment in favor of ADS with respect to the first count of Merck's action. Since it was agreed that the second count could not be sustained if the first count failed, this decision operated as a grant of judgment in the second count as well. We accordingly affirm the judgment below.

AFFIRMED.