998 F.2d 1010
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
L. Nathan MUNDY, Plaintiff-Appellant,
v.
PALMETTO FORD, INCORPORATED, Defendant-Appellee.
 No. 92-1041.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 10, 1993.
Decided: July 27, 1993.
As Amended Aug. 3, 1993.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston.
 Susan Corner Rosen, ROSEN, ROSEN & HAGOOD, for Appellant.
 Joseph Rutledge Young, Jr., YOUNG, CLEMENT, RIVERS & TISDALE, for Appellee.
 Stephen P. Groves, YOUNG, CLEMENT, RIVERS & TISDALE, Walter J. Kruger, III, FISHER & PHILLIPS, for Appellee.
 D.S.C.
 AFFIRMED.
 Before HALL, PHILLIPS, and LUTTIG, Circuit Judges.
 LUTTIG, Circuit Judge:
 
 OPINION
 
 1
 L. Nathan Mundy, appeals from an order of the United States District Court for the District of South Carolina, granting summary judgment to appellee, Palmetto Ford, Inc., on Mundy's wrongful discharge and retaliatory discharge claims. We affirm.
 
 I.
 
 2
 Palmetto Ford, Inc., ("Palmetto") hired Mundy as an at-will employee in 1985. Mundy was subsequently promoted to the position of Finance & Insurance Manager, a position that he shared with Loren Wilkins, a woman. Both Mundy and Wilkins reported directly to the Vice President of Sales, John Bethea. Mundy suggests that two May 1990 incidents precipitated Palmetto's decision to fire him on May 31, 1990. In the first, another Palmetto employee, Johnny Dangerfield, allegedly asked Mundy to forge a customer's signature on a rebate check. See J.A. at 64-66. In the second, Wilkins and Bethea phoned Mundy on his day off, and asked him to come into the office to complete certain paperwork. Although Mundy at first resisted, he eventually came in to the dealership, where he complained to Bethea that he believed that Wilkins was receiving preferential treatment. See id. at 66-67. Mundy questioned Bethea's objectivity because Bethea was having an affair with Wilkins and told Bethea that Bethea "might lose everything" as a result. Id. at 67. The next morning, Mundy complained to another Palmetto vice president, Hugh Cannon, that "the illicit affair was going on and that the situation was affecting John Bethea's judgment and was affecting [Mundy] at work." Id. at 68-69. Mundy also mentioned the forgery request. See id . at 69. Later that afternoon, Palmetto fired Mundy. Id.
 
 
 3
 Mundy then brought the instant suit against Palmetto, alleging wrongful termination and defamation under South Carolina law, and retaliatory discharge in violation of Title VII, 42 U.S.C. § 2000e-3(a). The district court granted Palmetto's motion for summary judgment on the wrongful termination and Title VII claims, see Fed. R. Civ. P. 56(c), and dismissed the pendent defamation claim without prejudice. See J.A. at 114-34. This appeal followed.
 
 II.
 
 4
 Mundy first challenges the district court's grant of summary judgment on his claim of wrongful discharge under South Carolina law. As an at-will employee, Mundy may be fired "for good cause, no cause or even cause morally wrong." Ludwick v. This Minute of Carolina, Inc., 287 S.C. 219, 337 S.E.2d 213, 214 (1985). There is, however, a "very narrowly applied" exception, of which Mundy seeks to avail himself: where the employee has been discharged for refusing to breach a "clear mandate of public policy." Merck v. Advanced Drainage Sys., Inc., 921 F.2d 549, 554 (4th Cir. 1990) (applying South Carolina law); Ludwick, 337 S.E.2d at 216.
 
 
 5
 We disagree with Mundy's contention that the episode in which he refused to forge a rebate check falls within this exception, which we held in Merck "is to be very marrowly applied." 921 F.2d at 554. South Carolina courts have only applied the exception to cases in which the employee's continued employment was unambiguously conditioned upon performance of an illegal act. In the absence of an express conditioning, Mundy contends that a cause of action for wrongful discharge could yet arise from an implied conditioning of his continued employment upon commission of a forgery. That may well be true. But in this case there were neither words nor circumstances from which a rational trier of fact could conclude that Mundy's employer had conditioned his continued employment upon commission of a forgery.
 
 III.
 
 6
 Mundy also argues that the district court erred in granting summary judgment on his Title VII retaliatory discharge claim. He contends that he presented a genuine question of fact as to whether Palmetto fired him in retaliation for complaining of sex discrimination and sexual harassment. We disagree. Mundy alleges no facts giving rise to an inference that he was discriminated against because of his gender. His affidavit shows that he thought Wilkins was receiving preferential treatment not because of her sex, but because of her consensual affair with Bethea. See J.A. at 67-69. Without more, complaining of this liaison was not protected activity under Title VII. Like the Second Circuit, "[w]e can adduce no justification for defining 'sex,' for Title VII purposes, so broadly as to include an ongoing, voluntary, romantic engagement." DeCintio v. Westchester County Medical Ctr., 807 F.2d 304, 307 (2d Cir. 1986) (rejecting Title VII sex discrimination suit brought by male employees in response to higher salary paid to female employee who had a consensual romantic relationship with department administrator), cert. denied, 484 U.S. 825 (1987); see also Autry v. North Carolina Dep't of Human Resources, 820 F.2d 1384, 1387 (4th Cir. 1987) (concluding that "a voluntary ongoing friendship would be an inappropriate basis for a Title VII suit," and describing DeCintio as "obvious[ly] applicab[le]").[2]
 
 
 7
 Nor has Mundy alleged facts from which one could reasonably infer that Palmetto fired him for opposing sexual harassment at the dealership. Although Mundy suggests in his affidavit that he believed that there was sexual harassment occurring, J.A. at 67, he does not allege in his affidavit that he communicated such a belief to either Cannon or Bethea. See id. at 66-69. In fact, he carefully avoids representing that he told either man that he harbored such a belief. See id. at 67-69. Mundy states that he advised Bethea only that he believed that he was being discriminated against, that Wilkins was receiving preferential treatment, and that Bethea could not be objective given his relationship with Wilkins. Id. at 67. And, correspondingly, he states that his concerns were for himself, Bethea, and the dealership. Id. He states that he told Cannon essentially the same things. Id. at 68-69.
 
 
 8
 Even in describing his uncommunicated beliefs, Mundy does not state that he believed Wilkins was being harassed by Bethea. Indeed, in neither the complaint nor the affidavit does Mundy identify any victim of sexual harassment, or the forms such harassment took. In his deposition, Mundy made the following assertion:"That next morning, I thought about the situation and noticed it to be a[sic] sexual harassment. That if for some reason Lorin [sic] got fired from the dealership, it was because her superior was having an affair with her and it left the dealership completely open." Id. at 200; see also id. at 243-44 (same), 246 (same). The import of this assertion, of course, is not that Bethea was harassing Wilkins or even that Mundy believed that Bethea was harassing Wilkins but, rather, that Mundy believed that it might be sexual harassment if Wilkins were ultimately to be fired for having the affair with Bethea. This statement appears to be, if anything, an acknowledgment by Mundy that he did not believe that Wilkins was being harassed at the time of his complaints to Bethea and Cannon, an interpretation confirmed by Mundy's briefs.[3] See Appellant's Br. at 36 (" [S]hould the 'voluntary' sexual relationship eventually become unwelcome, Palmetto Ford would be exposed to an actionable sexual harassment lawsuit." (Emphasis added)).[4]
 
 
 9
 Mundy's silence as to these essential elements of his claims is of course fatal to his effort to withstand summary judgment, for "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 CONCLUSION
 
 10
 For the reasons stated herein, we affirm the judgment of the district court.
 
 AFFIRMED
 PHILLIPS, Circuit Judge, dissenting in part:
 
 11
 I dissent from the judgment only insofar as it affirms the dismissal of Mundy's Title VII claim for failure to raise a genuine issue of material fact. I believe the district court and the majority have not properly applied to the summary judgment record the legal principles governing decision of the Title VII opposition clause claim, and that the district court erred in dismissing that claim by summary judgment.
 
 
 12
 I summarize those principles briefly in order to clarify the crux of my disagreement with the district court and with the majority here. Title VII prohibits an employer from retaliating against an employee who has opposed an employment practice made unlawful under the statute. 42 U.S.C. § 2000e-3(a). A prima facie"opposition clause" case consists of proof that (1) the employee engaged in a protected activity; (2) the employer took adverse employment action against the employee; and (3) the adverse action was motivated in part by the protected activity. Dwyer v. Smith, 867 F.2d 184, 190-91 (4th Cir. 1989).
 
 
 13
 An employee need not have instituted formal proceedings under Title VII in order subsequently to invoke the protection of the opposition clause; informal complaints to the employer will suffice. Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981). Nor need an employee show that the conduct complained of violated Title VII as a matter of law; it suffices to prove that he or she held a reasonable-even if mistaken-belief that the conduct violated the statute. E.g., Kralowec v. Prince George's County, 503 F. Supp. 985, 1008 (D.Md. 1980), aff'd, 679 F.2d 883 (4th Cir. 1982), cert. denied, 459 U.S. 872 (1982); see also Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992); Love v. RE/MAX of America, Inc., 738 F.2d 383, 385 (10th Cir. 1984) (collecting cases).
 
 
 14
 Thus, the burden on the opposition-clause plaintiff is relatively minimal. This is so because, as the district court recognized (albeit with some contortions, J.A. 128) more stringent standards ultimately would chill employees' attempts to resolve issues of perceived employment-related discrimination through informal communication with the employer. To protect themselves against possible retaliation, increasing numbers of employees would institute action through the EEOC instead, "burdening the employee, the employer, and the EEOC." Id.
 
 
 15
 Applying these principles, I cannot agree with the majority's apparent belief that it is a complete defense to an opposition-clause claim that the employee's informal complaint regarding allegedly discriminatory conduct in the workplace would not have succeeded as an independent cause of action under Title VII. Slip op. 4-5. Nor do I believe that the majority's assessment of the summary judgment record views Mundy's forecast of evidence in the light most favorable to him, as is his due, Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), or in light of the policy interests outlined above. When that is done, I believe Mundy's evidentiary materials suffice to fend off summary judgment, though they may of course fall flat in proof.
 
 
 16
 Specifically, I believe that Mundy's forecast of evidence, rightly assessed, raises genuine issues of material fact regarding whether he reasonably believed and communicated either (1) that the preferential treatment accorded to Wilkins constituted sex discrimination against himself, or (2) that the superior-subordinate relationship constituted sexual harassment of Wilkins per se. Either would suffice to hold at issue these critical elements of the opposition clause claim he alleged. With respect to the disparate-treatment prong of the opposition-clause claim, Mundy's assertion of a subjective belief that the preferential treatment of Wilkins constituted illegal discrimination surely is not sufficiently outlandish to warrant taking the question from the jury.* Cf. King v. Palmer, 778 F.2d 878, 880 (D.C. Cir. 1985) (approving the notion that "unlawful sex discrimination occurs whenever sex is for no legitimate reason a substantial factor in the discrimination") (internal quotation marks and citations omitted); see also EEOC Policy Guide, 405 BNA Fair Empl. Prac. Cas. at 6817-18 (J.A. 34-35) (finding it necessary to clarify that isolated instances of sexual favoritism based on consensual liaisons do not "discriminate against women or men in violation of Title VII").
 
 
 17
 With respect to Mundy's contention that he reasonably believed the affair to constitute sexual harassment per se, to which he expressed opposition protected by Title VII, I think the majority fails properly to take into account Mundy's forecast of evidence that at the time he complained to his superiors about the affair he"didn't know if Lorin [sic] was being pressured by John to enter into a relationship ... [or that she] felt compelled to do it because she wanted to hang on to her job," J.A. 246; that he did not "think it really mattered whether she was being forced into it," because he "knew[the relationship] was, by definition, sexual harassment and that the dealership was exposed," J.A. 247; that the source of that knowledge was Sam Lyons, who had served on the South Carolina Human Affairs Commission, J.A. 68, 240-41; and that he communicated that knowledge to Palmetto Vice President Hugh Cannon on Lyon's advice. J.A. 240, 243-44, 246-47.
 
 
 18
 With respect to the element of causation, Mundy produced evidence that Bethea spoke with Cannon shortly after Mundy did, J.A. 69; that Bethea denied the affair before both Cannon and Palmetto President Manley Eubank while simultaneously expressing his intention to fire Mundy for allegedly threatening to expose it, J.A. 272-73, 337-39; and that Bethea recognized that the company would not condone his relationship with a subordinate because"it would appear to people there that there could be preferential treatment." J.A. 314-15.
 
 
 19
 Because I believe that these summary judgment materials, properly assessed under the controlling opposition clause principles, raise genuine issues of material fact with respect to the key questions whether Mundy engaged in an activity protected under Title VII and whether that activity contributed causally to Palmetto's decision to discharge him, I dissent from Part III of the majority opinion. I would remand for further proceedings on the Title VII claim.
 
 
 
 [1]
 We find unpersuasive Mundy's reference to the Ludwick court's citation of cases from other states that did not involve an express requirement that the employee violate the law to keep his job. The Ludwick court did not comment on that aspect of those cases, citing to them instead for the more general proposition that there exists a "public policy" exception at all. See 337 S.E.2d at 215-16
 
 
 [2]
 In Autry, we viewed DeCintio as sufficiently relevant to warrant supplemental briefing on the specific question of that decision's applicability. See id. at 1386
 
 
 [3]
 Mundy does not dispute that the Wilkins-Bethea affair was consensual. See, e.g., J.A. at 246; cf. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.' " (citing 29 C.F.R. § 1604.11(a) (1985))
 
 
 [4]
 At argument, Mundy contended that he had believed Wilkins was being harassed by Bethea. Throughout his submissions, however, he appears to have contended that he was the victim of sexual harassment, suggesting that his claim now that Wilkins was the victim of sexual harassment is borne of an after-the-fact recognition of the meritlessness of his claim that he was discriminated against on the basis of his gender. See J.A. at 258 ("I feel that it was because in retaliation for my reporting sexual harassment, sexual discrimination that I was subsequently discharged."); Reply Br. at 13 (contending that he believed "that some form of sexual discrimination or harassment was occurring in the work place"); id. at 14 (contending that "Mundy properly reported what he rea sonably believed was sexual discrimination and/or sexual harassment in the work place"). This seemingly intentional confusion was apparently also recognized by the district court, which noted that Mundy had only "in effect" alleged that Bethea was harassing Wilkins. J.A. at 129; see also id. at 132 ("[T]his plaintiff does not appear to be asserting the 'right of a female employee to be free of sexual harassment in the work place.' " (citation omitted)); id. at 133 ("[P]laintiff apparently expresses no concern about the alleged victim....")
 The majority implicitly follows the district court's suggestion that evidence of genuine solicitude toward Wilkins or toward the status of women in the workplace generally might support a finding that Mundy's complaint was protected by Title VII. Slip op. at 5 n.3 (citing J.A. 129, 132). I agree that Mundy's defense to the Rule 56 motion would be strengthened by such evidence-as it would by evidence that the affair was coerced, or that the sexual favoritism was so widespread as to constitute a hostile workplace environment. See generally EEOC Policy Guide on Employer Liability for Sexual Favoritism Under Title VII, 405 Fair Empl. Prac. Cas. (BNA) 6817, 6818-21 (1990) (J.A. 35-38). I disagree, however, that such evidence is or ought to be a necessary predicate for a prima facie opposition clause claim involving complaints of sexual favoritism. As a practical matter, employees complaining of sexual favoritism in the workplace are likely to be moved-as Mundy patently was-to some extent at least, by concerns to secure or enhance their own employment prospect. It does not follow, however, that this type of subjective motivation necessarily negates a reasonable belief that such favoritism violates Title VII.