779 A.2d 408

SEARS, ROEBUCK AND CO., et al.,

v.

Edward L. WHOLEY.

No. 1490, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Aug. 29, 2001.

Karen A. Khan and Patrick F. Martin (Jackson, Lewis, Schnitzler & Krupman, on the brief), Washington, DC, for appellants.

James B. Hopewell (Patricia N. Drummond, Upper Marlboro, on the brief), Riverdale, for appellee.

Argued before DAVIS, DEBORAH S. EYLER and KRAUSER, JJ.

DEBORAH S. EYLER, Judge.

After Sears, Roebuck and Co. ("Sears"), the appellant, terminated Edward L. Wholey, the appellee, from his position

as Security Supervisor at the Sears store in Glen Burnie, Maryland, Wholey sued Sears and Paul Eiseman, a Regional Manager of Asset Protection Services for Sears, for wrongful discharge and defamation, among other claims. The case was tried before a jury, in the Circuit Court for Anne Arundel County, which returned a verdict against Sears on Wholey's wrongful discharge claim, in favor of Sears on the defamation claim, and in favor of Eiseman on both claims. The jury awarded Wholey $166,000 in damages.

From a judgment entered on that verdict, Sears appeals, presenting five questions for review. Four of the questions it presents raise a single legal issue: Whether, on the facts most favorable to Wholey, his termination violated a clear mandate of public policy. For the following reasons, we answer that question in the negative, and reverse the judgment.

## FACTS AND PROCEEDINGS

Wholey was employed by Sears in its Glen Burnie store for 24 years. He began as a security officer in 1972, and within a year was promoted to Assistant Security Manager. In 1980, Wholey again was promoted, to Security Manager. Finally, in 1994, he became a Security Supervisor. From 1980 until Sears terminated his employment in 1996, Wholey's work involved investigating employee theft.

Beginning in 1973, Wholey also worked as a constable for the District Court of Maryland. In 1980, Wholey became a deputy sheriff for the Anne Arundel County Sheriff's Office. He still was working in that position as of the date of trial.

In 1994, a new store manager was hired at the Glen Burnie Sears. Around March of 1995, Wholey began to notice that the store manager sometimes would remove items of merchandise from store display areas and put them in his office. As far as Wholey could tell, the items then would "just disappear." Wholey did not see the store manager remove any of these items from his office or take any of them from the store without paying for them. Wholey suspected, however, that the store manager was stealing the merchandise.

In November 1995, Wholey noticed that the store manager had two pairs of pants, "one or two" sweaters, and a jacket-all Sears merchandise-in his office. The items all bore store price tags. Wholey checked the store's cash registers to see if the store manager had purchased any of the items. When he found no receipts reflecting purchases, Wholey suspected that the store manager was going to steal the items by wearing or carrying them out of the store. He contacted Eiseman, who was responsible for security at the Glen Burnie Sears, and told him of his suspicions. Eiseman suggested that Wholey use a van to perform surveillance on the store manager's office from an outside window. Wholey did so, but the view from the van was so limited that Wholey could not tell from his surveillance whether the store manager was removing, or had removed, any of the items of merchandise from his office.

Wholey reported to Eiseman that the surveillance from the van was inadequate and asked permission to enter the store manager's office at night to search it. Eiseman granted permission. On the night of November 29, 1995, Wholey entered and searched the store manager's office. He also searched a locked drawer in the office, which he opened with his fingernail. Wholey's search revealed some but not all of the merchandise that he earlier had seen in the office. He did not know what had happened to the missing items of merchandise. He acknowledged at trial that these items could have been returned to the display floor.

From November 30, 1995 through December 14, 1995, Wholey continued to observe the store manager's movements. During that time, he did not see the store manager remove any of the items from his office.

On December 15, 1995, Wholey learned that the store manager had made an inquiry about what time one of the security guards would be coming on shift. When he learned that, he suspected that the store manager was going to remove the items of merchandise in his office from the store early the next morning and take them without paying for them. Wholey contacted Eiseman, told him of his suspicions,

and requested permission to install cameras in the ceiling of the store manager's office, to observe the store manager's actions.[1] According to Wholey, Eiseman gave him permission to install the cameras.

During the early morning hours of December 16, 1995, Wholey and Darlene Hill, the Security Manager for the Glen Burnie Sears, installed the cameras. Afterward, Hill went home and Wholey remained at the store.

Later that morning, but before the store manager arrived at work, Wholey called Eiseman and reported that the cameras had been installed. During this conversation, Wholey was watching the store's security cameras and noticed Sam Alexander, the District Store Manager and Eiseman's superior, enter the store. Wholey asked Eiseman whether he had told Alexander about the installation of the cameras in the store manager's office. Eiseman replied that he had not. Eiseman then ended the conversation with Wholey and called Alexander.

Sometime in the next two hours, Eiseman made a return call to Wholey and told him not to use the cameras in the store manager's office and to disable them. Eiseman explained that he had told Alexander and Thomas Peake, Sears's Human Resources Manger for the Northeast Region, about the cameras and they had ordered that the cameras not be used, because the store manager "deserve[d] more respect." Wholey complied with Eiseman's directive and disabled and removed the cameras. He discontinued his investigation of the store manager.

Throughout the time he was investigating the store manager, Wholey never saw the store manager commit the crime of theft (or any other crime). Also, at no time during the investigation did Wholey act in his capacity as a deputy sheriff for the Anne Arundel County Sheriff's Department.

On February 6, 1996, Wholey was terminated from his employment by Sears. Eiseman met with him that day and

---

1. The cameras in question did not record sounds.

told him that Alexander and Peake had not approved of his handling of the investigation of the store manager (particularly, the installation of cameras in the store manager's office). When Eiseman asked Wholey to resign, Wholey refused, and then was fired. Seven months later, Wholey brought this suit against Sears and Eiseman, in the Circuit Court for Anne Arundel County.[2]

Sears maintained that it terminated Wholey's employment because he mishandled security problems that occurred at the Glen Burnie store during a severe blizzard in January 1996. Wholey took the position that that was a pretext, and that the true reason for his firing was in retaliation for his investigating suspected theft by the store manager. In the posture in which this appeal presents itself, we shall assume that Sears discharged Wholey for his handling of the investigation of the store manager, as Wholey contended, and not for any alleged actions or inactions by him during the January 1996 blizzard.

With respect to the wrongful discharge claim, Sears filed a motion to dismiss, which was denied, and then a motion for summary judgment, which also was denied. In both motions, it argued that, assuming the facts as alleged and as later testified by Wholey in deposition, Wholey's termination from employment did not violate a clear mandate of public policy, and thus was not actionable. *See Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) (*"Adler I"*). Sears advocated that position again during trial, when it moved for judgment at the close of Wholey's case and again at the close of the entire case. Each time Sears raised this issue, Wholey responded by arguing that the public policy of Maryland favors the investigation and prosecution of crimes and that when Sears terminated him for investigating suspected theft by the store manager, it did so in contravention of that clear mandate of public policy.

---

2. As originally filed, Wholey's complaint stated claims for wrongful discharge, defamation, and breach of contract against both defendants. The circuit court granted motions to dismiss the breach of contract claims. Its ruling in that regard is not an issue in this appeal.

The trial court agreed with Wholey on the public policy issue. After denying Sears's motions for judgment, it instructed the jury as follows, over Sears's objection:

[I]n order to recover for wrongful discharge, [Wholey] must show, one, an at-will employment relationship; two, that he was terminated by the employer and that the discharge was contrary to a clear mandate of public policy. . . .

Now, there is a clear public policy in Maryland favoring the investigation and prosecution of criminal offenses.

If you find that the motivation of [Sears] in firing [Wholey] was in retaliation to [Wholey's] investigatory activities, then that motivation would contravene the stated public policy of Maryland. You must also find that [Wholey's] investigatory activities were lawful and in accordance with the stated procedures set forth by [Sears].

Within ten days after entry of judgment, Sears filed a motion for judgment notwithstanding the verdict, again asserting that Wholey's discharge did not violate a clear mandate of public policy. Sears also filed a motion for a new trial, in which it argued that the jury had failed to consider the issue of mitigation of damages. The circuit court denied both motions on July 12, 1999.

Sears then noted a timely appeal.

## DISCUSSION

Sears contends that with respect to Wholey's wrongful discharge claim, the circuit court erred in denying its motions to dismiss, for summary judgment, for judgment, and for judgment notwithstanding the verdict, and in instructing the jury, because on the version of the facts most favorable to Wholey, his termination from employment did not violate a clear mandate of public policy, as a matter of law. Sears argues that there is no clear mandate of public policy favoring the investigation of suspected criminal activity in Maryland; therefore, Wholey's claim was without legal foundation. In pressing this argument, Sears relies primarily upon the decision of the United States Court of Appeals for the Fourth

Circuit in *Adler v. American Standard Corporation,* 830 F.2d 1303 (4th Cir.1987) *("Adler III").*[3]

Wholey counters that the circuit court properly concluded, as a matter of law, that in Maryland there is a clear mandate of public policy in favor of investigating criminal activity. Therefore, its denial of Sears's motions and its instruction to the jury were not in error. In advancing his argument, Wholey relies primarily upon the Court of Appeals's favorable reference to *Palmateer v. International Harvester,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), in *Adler I,* 291 Md. at 39, 432 A.2d 464.

■ Wholey was an at-will employee of Sears: He did not have an employment contract and was hired for an indefinite term. *See Samuels v. Tschechtelin,* 135 Md.App. 483, 525, 763 A.2d 209 (2000) (citing *Hrehorovich v. Harbor Hosp. Ctr.,* 93 Md.App. 772, 790, 614 A.2d 1021 (1992); *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202 (1995)). Ordinarily, an at-will employee may be discharged by his employer for any reason or for no reason. *Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md.App. 470, 494–95, 665 A.2d 297 (citations omitted).

■ The tort of wrongful discharge is a narrow exception to this well-established principle. The elements of the tort are: "(1) that the employee was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire the employee." *Shapiro,* 105 Md.App. at 764, 661 A.2d 202 (citing *Leese v. Baltimore County,* 64 Md.App. 442, 468,

---

**3.** The questions presented by Sears in its brief are:
1. Whether the trial court erred in denying Appellant's Motion for Summary Judgment.
2. Whether the trial court erred in denying Appellant's Motion for Judgment and Motion for Judgment Notwithstanding the Verdict.
3. Whether the trial court erred in its instructions to the jury.
4. Whether the trial court erred in denying Appellant's Motion to Dismiss the Complaint.
5. Whether the trial court abused its discretion in denying Appellant's Motion for New Trial.

497 A.2d 159 (1985)). A public policy must be clearly mandated to serve as a basis for a wrongful discharge action because that "limits judicial forays into the wilderness of discerning 'public policy' without clear direction from a legislature or regulatory source." *Milton v. IIT Research Inst.*, 138 F.3d 519, 523 (4th Cir.1998); *see also Gaskins v. Marshall Craft Assocs.*, 110 Md.App. 705, 715, 678 A.2d 615 (1996) (citation omitted). "When a plaintiff fails to demonstrate that his or her grievance is anything more than a private dispute regarding the employer's execution of normal management operating procedures, there is no cause of action for [wrongful] discharge." *Lee v. Denro*, 91 Md.App. 822, 833, 605 A.2d 1017 (1992).

 " 'Legislative enactments, prior judicial decisions, [and] administrative regulations' are 'the chief sources of public policy.' " *Bleich v. Florence Crittenton Servs. of Baltimore, Inc.*, 98 Md.App. 123, 134, 632 A.2d 463 (1993) (quoting *Lee*, 91 Md.App. at 830, 605 A.2d 1017 (citation omitted). While it is possible that a clear mandate of public policy may exist in the absence of a constitutional, statutory, or regulatory pronouncement, this possibility "should be accepted as the basis of judicial determination, if at all, only with the upmost circumspection.' " *Townsend v. L.W.M. Mgmt., Inc.*, 64 Md. App. 55, 61–62, 494 A.2d 239 (1985) (quoting *Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 74 L.Ed. 854 (1930)); *see also Bagwell*, 106 Md.App. at 495–96, 665 A.2d 297 ("[R]ecognition of an otherwise undeclared public policy as a basis for judicial decision involves the application of a very nebulous concept to the facts of the case, a practice which should be employed sparingly, if at all." (citations and internal quotation marks omitted)); *Lee*, 91 Md.App. at 831, 605 A.2d 1017 (noting that, although "Maryland appellate courts have decided several cases involving [wrongful] discharge claims since *Adler*, they have never found such a claim to be stated absent a discharge which violates a public policy set forth in the constitution, a statute, or the common law") (citations omitted).

The Court of Appeals first recognized the tort of wrongful discharge in *Adler I, supra*, 291 Md. 31, 432 A.2d 464, in which it was responding to two certified questions posed by the United States District Court for the District of Maryland. The pertinent facts of *Adler I* are as follows. Three years after Gerald F. Adler was hired by American Standard, he was appointed acting president of one of its subsidiary companies. Adler discovered that the outgoing president of the subsidiary, Bernard Greene, had been using a company account to pay kickbacks to clients and had been altering company records to cover up the scheme. Adler reported this information to two of his superiors and told them that he planned to disclose it to high company officials at an upcoming meeting. The night before the meeting, Adler's superiors fired him. Soon afterwards, Greene was reappointed president of the subsidiary company.

Adler sued American Standard for wrongful discharge, alleging, *inter alia*, that he had been discharged to prevent his disclosure of a number of "improper and possibly illegal practices," by Greene and American Standard. (These practices included attempts to treat capital expenditures as expenses; payment of commercial bribes; falsification of corporate sales and income data and alteration of commercial documents to support the falsified information; misuse of corporate funds by officers for their personal benefit; manipulation of work-in-progress inventory information; and alteration of forecasts in connection with intra-corporate financial reporting.) *Adler I*, 291 Md. at 33, 432 A.2d 464. The district court certified two questions to the Court of Appeals:

(1) Is a cause of action for "[wrongful] discharge" recognized under the substantive law of the State of Maryland? [and]

(2) Do the allegations [by Adler], if taken as true, state a cause of action for "[wrongful] discharge" under the substantive law of the State of Maryland?

*Id.* at 32, 432 A.2d 464.

After surveying decisions of courts that had considered the cause of action for wrongful discharge, discussing those deci-

sions adopting the tort, and examining the violations of public policy that other courts had ruled sufficient to make the discharge of an at-will employee actionable, the Court of Appeals responded affirmatively to the first question. It answered the second question in the negative, however, saying that Adler's allegations were not sufficient to state a cause of action for wrongful discharge. Adler had argued, *inter alia,* that Greene's conduct violated Md.Code (1957, 1976 Repl.Vol.) art. 27 § 174, which makes it a crime for officers of a corporation to fraudulently sign or assent to any statement "containing untruthful representations of [the corporation's] affairs, assets or liabilities with a view either to enhance or depress the market value of the shares therein, or the value of its corporate obligations, or in any manner to accomplish any fraud thereby...." The Court held that the averments in Adler's complaint were "too general, too conclusory, too vague, and lacking in specifics to mount up to a prima facie showing that the claimed misconduct contravened § 174 and hence violated the public policy of this State." *Adler I,* 291 Md. at 44, 432 A.2d 464.

> Adler's complaint does not assert that the falsification of corporate records was done with an intent to defraud either stockholders or the public at large by enhancing or depressing the market value of [American Standard's] shares or other obligations. As a result, the allegations of the complaint do not set forth a violation of the conduct proscribed by § 174. Indeed, during oral argument of the case before us, Adler's counsel was asked whether his complaint was intended to allege the commission of a crime. In response, he stated that he could not say one way or the other whether the claimed misconduct constituted a crime.

*Id.* at 44, 432 A.2d 464.

After the case was returned to the district court, Adler amended his complaint to allege, *inter alia,* that other employees of American Standard had violated various federal and state tax laws and that he was terminated from employment so as to conceal these alleged violations. American Standard again moved to dismiss, arguing that the statutes in question

did not establish a clear mandate of public policy that would support a cause of action for wrongful discharge. The court denied the motion, ruling that Adler had

> alleged, with sufficient particularity, that he threatened the exposure of [American Standard's] violations of federal tax laws, that he was fired as a result and that the tendency of such firing was to prevent the disclosure of these violations, in contravention of a clear federal public policy, which is incorporated as a public policy by the State of Maryland.

*Adler v. American Standard Corp.,* 538 F.Supp. 572, 580 (D.Md.1982) (*"Adler II"*).

On the eve of trial, Adler told the court that he intended to prove that American Standard had terminated him to conceal violations of theft and federal mail fraud statutes in addition to the statutes that he had identified in his second amended complaint. At the close of the evidence, the federal district court ruled that Adler had failed to prove that American Standard had violated any of the statutes referenced in his second amended complaint. Nonetheless, it sent the wrongful discharge claim to the jury. It instructed the jury to find for Adler on that claim if it determined that his termination had resulted from his stated intention to disclose the kickbacks and from the ensuing cover-up. The jury found for Adler and awarded $1,232,000 in compensatory damages.

In *Adler III,* the United States Court of Appeals for the Fourth Circuit reversed, holding that Adler had failed to prove that the decision to terminate his employment had been in violation of a clear mandate of public policy. The Court held that, while the public policy of Maryland clearly proscribes terminating an at-will employee for refusing to engage in illegal activity or for complying with, or stating an intention to fulfill, a statutorily prescribed duty, it did not proscribe terminating such an employee for "whistle blowing." The Fourth Circuit made the following pertinent observations:

> *Limitation of the claim for [wrongful] discharge to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty, ties [wrongful] discharge claims down to a managea-*

*ble and clear standard.* This analysis is consonant with the stated intention of the Maryland Court of Appeals in *Adler* [*I*] to preserve the rights of the employer to terminate employees at will, subject only to the limited exceptions created by statute and to the relatively limited instances where a clear mandate of public policy has been violated. As a general prudential rule, legislatures have traditionally been reluctant to impose affirmative obligations on citizens to report or prevent crimes because defining what is a crime and to whose knowledge is a very difficult and intrusive inquiry. This reluctance imparts caution to this court. . . . In the absence of a clear declaration by a legislature or the Maryland Court of Appeals that an action for [wrongful] discharge should be extended to situations where the discharged employee claims to have had the knowledge and the intent to report wrongdoing to a higher corporate official, this court should not create such a ruling. We find that the district court erred in determining that the plaintiff had properly stated and proved a cause of action for [wrongful] discharge under Maryland law.

What Adler presented at his trial was little more than the allegations and the reasonable inferences to be drawn therefrom, that were presented to the Maryland Court and found insufficient to represent a violation of "some clear mandate of public policy." His allegations and his evidence reveal nothing more than his discharge resulting from his intention to "blow the whistle" on illegal activities condoned by his supervisors . . . and their efforts to protect themselves by discharging him. This is not a violation of clearly mandated Maryland public policy and it does not involve an effort by Adler to fulfill a statutorily prescribed duty nor his failure to engage in illegal activity.

*Id.* at 1307 (footnote omitted) (emphasis added).[4]

As we have said, while Sears relies on *Adler III* to support its argument on appeal, Wholey urges us to follow the holding

---

4. Judge Butzner wrote a dissenting opinion in *Adler III*, in which he disagreed with the majority's holding that Maryland law did not pro-

of the Supreme Court of Illinois in *Palmateer v. International Harvester, supra,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, a case that was decided two months before *Adler I* and was cited favorably by the Court of Appeals in *Adler I.* In *Palmateer,* an at-will employee of the defendant suspected that a co-employee might be committing theft. He reported his suspicions to local law enforcement officials, and offered to assist them in the investigation and trial of the employee. When his employer learned of this, it fired him. In a 4 to 3 decision, the Supreme Court of Illinois held that terminating an at-will employee for reporting a crime to the authorities is contrary to the "clear public policy favoring investigation and prosecution of criminal offenses," and therefore gives rise to a cause of action for wrongful discharge. *Id.* 52 Ill.Dec. 13, 421 N.E.2d at 880. In *Adler I,* our Court of Appeals quoted from the majority's opinion in *Palmateer.* It also quoted the dissent's criticism, however: " 'Here the public policy supporting the cause of action cannot be found in any expression of the legislature but only in the vague belief that public policy requires that we all become "citizen crime fighters." ' " *Adler I,* 291 Md. at 39–40, 432 A.2d 464 (quoting *Palmateer,* 52 Ill.Dec. 13, 421 N.E.2d at 881) (citation omitted).[5]

---

vide Adler with a viable claim for wrongful discharge. Relying on Adler's trial testimony that he would not condone or participate in the *future* illegal activities allegedly planned by other employees of American Standard, Judge Butzner observed:

It is Adler's refusal to commit unlawful acts that distinguishes this case from those where whistle blowers, who did no more than accuse other persons of derelictions, were not given protection. Indeed, when a whistle blower is also the person who must decide whether a course of illegal conduct will continue, implicit in his disclosure of the illegality to his superiors is his renunciation of its continuance in the absence of any express intention to the contrary.

*Id.* at 1308 (Butzner, J., dissenting). We note that, unlike Adler, Wholey would not have faced civil or criminal liability for the actions of the store manager.

5. Since *Adler I,* the Court of Appeals has cited *Palmateer v. International Harvester, supra,* one more time. In *Makovi v. Sherwin–Williams Co., supra,* 316 Md. 603, 561 A.2d 179, the Court observed that *Palmateer* illustrated the "performing an important public obligation" category in which some courts have identified a clear mandate of public policy as

In the twenty years since *Adler I* was decided, the Maryland appellate courts have on a number of occasions considered whether and what public policies exist, and are sufficiently clear, so that, when implicated in the termination of an at-will employee, they will support an exception to the at-will employment doctrine. Recently, the Fourth Circuit observed that the cases in which the Maryland appellate courts have identified a clear mandate of public policy are limited to two circumstances: "(1) Where an employee has been fired for refusing to violate the law or the legal rights of a third party, ... and (2) Where [an] employee has been terminated for exercising a specific legal right or duty," *Milton*, 138 F.3d at 522 (quoting *Thompson v. Memorial Hosp. at Easton*, 925 F.Supp. 400, 406 (D.Md.1996)).[6]

---

identified in Note, *Protecting Employees at Will Against Wrongful Discharge: The Public Policy Exception*, 96 Harv. L.Rev.1931, 1936–37 (1983). (This Court has cited *Palmateer* once, with respect to the tort of intentional infliction of emotional distress. *Peoples Sec. Life Ins. Co. v. Watson*, 81 Md.App. 420, 437, 568 A.2d 835 (1990), *vacated*, 322 Md. 467, 588 A.2d 760 (1991).

**6.** For examples of cases in the first category, *see Kessler v. Equity Mgmt., Inc.*, 82 Md.App. 577, 586–90, 572 A.2d 1144 (1990) (concluding that wrongful discharge action lies for termination of at-will employee for refusal to break into apartments of residents delinquent in rent); *see also Makovi v. Sherwin–Williams Co.* 316 Md. 603, 630–31, 561 A.2d 179 (1989) (noting that several states have recognized wrongful discharge causes of action for refusing to commit unlawful acts (citations omitted). For examples of cases in the second category, which are more numerous, *see Insignia Residential Corp. v. Ashton*, 359 Md. 560, 573, 755 A.2d 1080 (2000) (holding that a wrongful discharge action lies for terminating an at-will employee for refusing to submit to *quid pro quo* sexual harassment); *Molesworth, supra,* 341 Md. at 628–37, 672 A.2d 608 (finding a viable cause of action for wrongful discharge when an employer discharged an at-will employee in violation of the Fair Employment Practices Act when the Act did not set froth a sanction for the employer); *Watson v. Peoples Sec. Life Ins. Co.,* 322 Md. 467, 480–81, 588 A.2d 760 (1991) (concluding that a wrongful discharge action lies for termination of at-will employee for bringing suit against another employee for "workplace sexual harassment culminating in assault and battery"); *Ewing v. Koppers Co.,* 312 Md. 45, 50, 537 A.2d 1173 (1988) (holding that a wrongful discharge action lies for terminating at-will employee solely because he filed a workers' compensation claim); *De Bleecker v. Montgomery County,* 292 Md. 498, 506–13, 438 A.2d 1348 (1982) (holding that a wrongful discharge action will lie for terminating

In *Milton, supra*, 138 F.3d 519, the Fourth Circuit, applying Maryland law, adhered to its holding in *Adler III* that discharging an at-will employee for "whistle-blowing" is not a violation of clearly mandated Maryland public policy, unless the employee had a legal duty to report the criminal activity. In that case, the employee became convinced that the employer corporation was engaging in illegal schemes to avoid reporting certain taxable income to the Internal Revenue Service. He reported his concerns to others in the company, and an internal investigation of the matter revealed that at least some of his concerns were justified. When his superiors failed to take action to rectify the problem, the employee reported his concerns to the chairman of the board. His superiors then demoted him; when he complained, he was fired. The Fourth Circuit affirmed a federal district court's dismissal of the employee's wrongful discharge claim because he did not (and could not) allege that he was fired for refusing to engage in unlawful activities himself, or that he had a statutory duty to disclose the company's wrongdoing to its board. *See also Thompson*, 925 F.Supp. at 407–08 (applying Maryland law and holding that an at-will hospital employee did not have a cause of action for wrongful discharge when his employment was terminated for reporting to federal authorities a misadministration of radiation, which was the duty of the hospital alone); *Shapiro*, 105 Md.App. at 768–69, 661 A.2d 202 (refusing to consider a claim of wrongful discharge "absent some clear *mandate* " or duty for which the plaintiff himself "actually could be held responsible").

As the divergent opinions in *Palmateer* and *Adler III* illustrate, appellate courts in this country are not all of the same view on the question whether an at-will employee who

---

an at-will employee for exercising his First Amendment rights); *Bleich*, 98 Md.App. at 134, 632 A.2d 463) (finding a viable wrongful discharge claim for terminating an at-will employee for fulfilling a statutory duty to report child abuse or neglect); *Moniodis v. Cook*, 64 Md.App. 1, 10, 494 A.2d 212 (1985) (permitting an at-will employee to pursue a wrongful discharge claim based on his refusal to take a lie detector test when such a demand is prohibited by statute).

was fired for "whistle blowing" can sue for wrongful discharge when he was not personally obligated to report unlawful conduct but his act of doing so was beneficial to society:

> Appellate courts in some jurisdictions that have allowed a cause of action for retaliatory discharge have refused to extend protection to the whistleblower primarily on the ground that the whistleblower is a volunteer, not relying on a personal legal obligation.

William J. Holloway & Michael J. Leech, *Employment Termination Rights and Remedies* 179 (2d ed.1993) (citations omitted); *see also* 2 Henry H. Perritt, Jr., *Employee Dismissal Law & Practice* § 7.35, at 99 (3d ed.1992) (citations omitted); 1 Paul H. Tobias, *Litigating Wrongful Discharge Claims* § 5:07, at 24 (2000) (citations omitted). In contrast, other jurisdictions conclude that, when an employee investigates and reports criminal activity,

> the employee seeks to benefit society as a whole, instead of asserting a personal right.... There is no public policy more fundamental than the government's efforts to protect life and property than enforcement of the laws.... Permitting employees to fire whistleblowers undermines public policy.

1 Tobias, *supra*, § 5:13, at 41 (citations omitted).

In the case at bar, Wholey, like the plaintiff in *Palmateer*, points to the general theft statute, at Md.Code (1957, 1996 Repl.Vol., 2000 Supp.), art. 27 § 342, as the source of the "clear mandate of public policy" supporting his wrongful discharge action. That statute makes theft a crime, but does not impose on citizens a duty to investigate or report theft. Moreover, investigation of theft against Sears was the essence of Wholey's job responsibility. In that respect, we find the decision of the Supreme Court of Virginia in *City of Virginia Beach v. Harris*, 259 Va. 220, 523 S.E.2d 239 (2000), enlightening.

In *Harris*, an officer with the City of Virginia Beach Police Department was investigating a burglary complaint when he became involved in a physical altercation with the sister of the

tenant whose apartment had been burglarized. After the situation had calmed down, the officer contacted his supervisor, and told him what had happened. Another officer at the scene told the supervisor that the officer's actions had caused the incident to escalate.

The supervisor decided not to bring charges against the victim's sister until an investigation of the incident was completed. He instructed the officer who had gotten into the altercation to release the victim's sister to the custody of the internal affairs division. The officer did so, but also obtained a warrant against the victim's sister, which he had another officer serve. The officer also obtained a warrant against the victim. When the officer's supervisor learned about the warrants, he demanded that the officer give him the unserved warrant for the victim. The officer did so and the supervisor placed the warrant in his desk. When the charges against the victim's sister came to trial, the captain of the City of Virginia Beach Police Department sent a letter to the court requesting that they be *nolle prossed* because the officer had obtained the warrant without permission. The officer then appeared before a magistrate and obtained warrants against his supervisor for two charges of obstruction of justice and one charge of delay in executing lawful process. At that point, the officer was discharged from employment.

The officer brought a wrongful discharge action against the City of Virginia Beach and several members of the police department. He argued that the criminal statutes prohibiting obstruction of justice and delay in executing legal process established a clear mandate of public policy that the City violated when it discharged him. At the close of the evidence, the trial court held that the officer had been wrongfully discharged because no one, including the officer's supervisor, had the authority to order a police officer not to arrest a person who had violated the law and, as a matter of law, the City of Virginia Beach was liable. The jury returned a verdict against the individual defendants.

The Supreme Court of Virginia reversed. With regard to the liability of the City of Virginia Beach, it observed that, under Virginia law, an at-will employee may recover in a wrongful discharge claim if he can show that his termination was in contravention of a statute "designed to protect the 'property rights, personal freedoms, health, safety, or welfare of the people in general.' " *Id.* at 245 (citation omitted). The court held that the officer could not rely on the general obstruction of justice criminal statute as a basis for his wrongful discharge claim, however, because the statute,

> defines the elements of, and sets forth the criminal penalties for, the crime of obstruction of justice, and, accordingly, reflects the General Assembly's intent to prohibit interference with the administration of justice. *That section does not explicitly state any public policy, but, like all criminal statutes, it has as an underlying policy the protection of the public's safety and welfare. . . . However, [the officer's] reliance on the statute is not in accord with that policy. Instead, [the officer] is attempting to use [the general obstruction of justice statute] as a shield to protect himself, not the public, from the consequences of his decision to charge [his supervisor] with obstruction of justice despite his supervisor's order to take no further action in an official capacity with regard to any aspect of the incident involving [the tenant and his sister].* To utilize this criminal statute as [the officer] suggests would allow wrongful discharge lawsuits to be pursued by virtually any police officer who believes that personnel decisions obstructed the officer's enforcement of the law.

*Id.* at 246 (emphasis added). The court applied the same analysis to the statute prohibiting delay in executing lawful process criminal. *Id.* at 246 n. 10.

From our examination of the Maryland decisional law and other pertinent authorities, such as the opinion of the Supreme Court of Virginia in *Harris,* we conclude that no clear mandate of public policy was implicated in Sears's termination of Wholey's employment, as a matter of law. In those Maryland cases recognizing a mandate of public policy well-estab-

lished enough to form the predicate for an action for wrongful discharge, there was a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct (or contemplated conduct) in question, so as to make the Maryland public policy on the topic not a matter of judicial conjecture or even interpretation. For example, in *Moniodis v. Cook*, 64 Md.App. 1, 494 A.2d 212, in which we held that the defendant employer was subject to a wrongful discharge action for constructively terminating employees who refused to submit to a lie detector test, it was not necessary for us to speculate, on the vague basis of whether it would be beneficial to society as a whole, about whether the public policy of Maryland disfavored employers subjecting employees to polygraph examinations. The General Assembly had made plain, by enacting a statute prohibiting that very conduct, where the state stands on that issue. *See id.* at 6–7, 494 A.2d 212 n. 1 (quoting Md.Code (1979) art. 100 § 95).

The conduct at issue in this case is one employee's act of investigating possible theft from his employer by a co-employee. Nothing in Maryland's general theft statute or any other enactment mandates that a citizen of Maryland who suspects that another person (co-employee or otherwise) may have committed a theft must report, let alone investigate, that suspicion. Indeed, there is no enactment that would require a citizen to report, let alone investigate, an admitted act of theft. To be sure, it might serve the public good for citizens to look into possible criminal acts of others, including co-employees, and report their suspicions to the authorities. We do not subscribe to the view, however, that conduct we might think would promote the good of society as a whole is, because we think so, favored public policy of this State. To find a clear mandate of public policy, we must look to already existing sources of policy expression. In the absence of any legislative or existing judicial pronouncement in this state directing private citizens to investigate possible acts of theft by co-workers or others, we find no origin for the public policy essential to Wholey's wrongful discharge claim.

It is worth noting that while Wholey relies on the language of the court in *Palmateer v. International Harvester* to support his public policy argument, that court did not hold that the public policy of Illinois favored citizens conducting their own investigations of possible criminal conduct of co-workers. The court focused its attention on the employee's act of reporting his co-employee's criminal act to the police. In Maryland, we have found a clear mandate of public policy in favor of reporting possible criminal conduct of others to the authorities when, by statute, a person is required to make such a report. *See Bleich,* 98 Md.App. at 135–46, 632 A.2d 463. There was no such statutory directive in this case.

Moreover, even if we were to assume, hypothetically, that there is a clear mandate of public policy in Maryland favoring private citizen's reporting, and even investigating, criminal conduct of co-employees, we still would not find that policy implicated here, for much the same reason that the court in *Harris* rejected the officer's claim that he was advancing public policy by pursuing charges against his supervisor.

As we have pointed out, it was Wholey's job to investigate possible theft by Sears employees against Sears. He was hired and paid to serve that function, and to do so at the direction of supervisors who were the ultimate decision-makers about whether, when, how, and to what extent to investigate and pursue employees suspected of having committed theft against the business. Like the officer in *Harris,* Wholey's invocation of public policy would serve not to benefit the public good, but to convert his at-will employment to one in which he no longer would be subject to direction from superiors and instead would have *de facto* lifetime tenure. So long as Wholey's job consisted of investigating possible criminal activity by co-employees, he would be immune from being discharged, because terminating his employment necessarily would interfere with the supposed public policy favoring citizen investigation of crime.[7]

---

7. Before the trial court, Wholey asserted that, if he had had probable cause to suspect that the store manager was committing the crime of

Maryland's public policy exception to the at-will employment doctrine did not limit Sears's discretion to terminate Wholey's employment, under the facts most favorable to Wholey. Because the necessary legal predicate for Wholey's wrongful discharge claim was absent, we shall reverse the judgment of the circuit court.

**JUDGMENT REVERSED. COSTS TO BE PAID BY THE APPELLEE.**

theft, he would have had a duty, in his capacity as deputy sheriff, to arrest him. Wholey conceded, however, that he was acting at all times relevant to his case as an employee of Sears, that his investigation of the store manager was outside of his duties as a sheriff's deputy, and that he never had probable cause to suspect that the store manager had committed a crime, so as to trigger his duties as a deputy sheriff. Therefore, any legal duties that Wholey may have had in his role as a deputy sheriff were not implicated by his investigation of the store manager.