REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0369

September Term, 2014

_____

PAULA HOLDEN

v.

UNIVERSITY SYSTEM OF MARYLAND,
et al.

_____

Zarnoch,
Hotten,
Eyler, James R.
        (Retired, Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed:  April 3, 2015

Appellant, Paula Holden, filed a complaint in the Circuit Court for Baltimore City against appellees, the University of Maryland Eastern Shore ("UMES") and the University System of Maryland ("USM"), alleging wrongful termination. Thereafter, the Circuit Court for Baltimore City granted appellees' motion to transfer the case for venue purposes to the Circuit Court for Somerset County. Appellant then amended her complaint to add Dr. Jennifer Keane-Dawes ("Dr. Keane-Dawes"), as a defendant. Appellees moved to dismiss the amended complaint for failure to state a claim, asserting that appellant failed to allege facts upon which USM could be held liable, and asserted statutory immunity on behalf of Dr. Keane-Dawes. Following a hearing, the circuit court granted appellees' motion to dismiss, indicating that appellant failed to allege a "clear mandate of public policy" for the claim of wrongful termination. Appellant appealed and presents one question for our consideration:

I.     Did the [circuit] court erroneously dismiss [a]ppellant's wrongful discharge claim in finding that [a]ppellant did not articulate a "clear" mandate of public policy because Title III does not expressly prohibit the use of Title III funds for student recruitment even thought [a]ppellees clearly believed such funds could not be used for student recruitment?

For the reasons that follow, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

In August 2009, appellant was promoted as the Coordinator of Graduate Admissions and Programs at UMES as an at-will employee. Appellant indicated that her duties were "to compile, manage, and develop a tracking and retention mechanism of all students in Title III activity components; focus on progress to degree and degree completion in the

Graduate Program; and work with Title III activity components to strengthen and enhance curriculum."

According to appellant's complaint, her employment was contingent upon successful recruitments to the graduate school. On August 30, 2010, appellant's supervisor, Dr. Keane-Dawes held a meeting between appellant and two of her co-workers. During the meeting, Dr. Keane-Dawes informed appellant that she needed to recruit new students into the graduate school and was given one academic year to do so. Thereafter, appellant communicated to Dr. Keane-Dawes that she believed Title III prohibited use of its funds for recruitment activities and therefore, appellant's employment could not be made contingent upon participation in student recruitment activities. Subsequently, appellant exchanged emails between the Human Resources Department and the Assistant Attorney General regarding the procedures governing grievances at UMES.

On October 15, 2010,[1] appellant filed a grievance, contending that her "employment and appraisal was threatened if [she did] not bring 'warm bodies in here'—recruitment[]" and that her "performance and appraisal [could not] be a condition of recruitment efforts under Title III regulations because her salary was funded entirely by Title III grant money."

On October 19, 2010, the funding for appellant's position was modified to reflect that only half of her salary was derived from Title III funds. Appellant appealed this decision to the Vice President of Academic Affairs, Charles Williams ("Dr. Williams"),

---

[1] On October 13, 2010, appellant received an email from Dr. Keane-Dawes stating, "This correspondence is effective today. Until further notice, please do not participate in any recruitment activities for the Graduate School."

and Dr. Williams stated that appellant did not have a cause for grievance on the remaining issues.

On September 20, 2011, shortly after a dispute with a co-worker, UMES placed appellant on administrative leave with pay for one calendar year, at which time her termination, without cause, would be effective.

On July 18, 2013, appellant filed a complaint in the Circuit Court for Baltimore City against USM and UMES. USM filed a motion to dismiss because appellant failed to state a claim and both USM and UMES filed motions to dismiss for lack of venue or, in the alternative, motion to transfer venue. The Circuit Court for Baltimore City ordered that the case be transferred to Somerset County because the cause of action arose at UMES in Princess Anne, Maryland in Somerset County and all individuals alleged to have participated in the wrongful acts were employees of UMES. Additionally, appellant resided in Somerset County and her complaint indicated that all the actions and events associated with the case occurred at UMES, with no reference to anything occurring in Baltimore City. The court did not rule on USM's motion to dismiss.

On January 28, 2014, appellant filed an amended complaint, adding Dr. Keane-Dawes as a defendant, in the Circuit Court for Somerset County, alleging one count for wrongful termination. Appellees filed a motion to dismiss the amended complaint for failure to state a violation of a clear mandate of public policy. Specifically, appellees argued that, "the complaint lack[ed] any express statutory language from Title III prohibiting recruitment activities as a use of Title III fund—a necessary requirement for [appellant's] claim for wrongful discharge." In response, appellant contended that her

- 3 -

complaint should not be dismissed because "[appellees] believed § 1063 prohibited the use of Title III funds for student recruitment."

The circuit court held a hearing on April 17, 2014 and granted appellees' motion to dismiss.[2] Appellant noted a timely appeal. Additional facts shall be provided, *infra*, to the extent they prove relevant in addressing the issues presented.

## STANDARD OF REVIEW

Pursuant to Maryland Rule 2-322(b)(2), "a party may seek dismissal of a complaint if the complaint fails to state a claim upon which relief can be granted." *Id.* "The standard for reviewing the grant of a motion to dismiss is whether the circuit court was legally correct." *Norman v. Borison*, 192 Md. App. 405, 419 (2010) (citing *Sprenger v. Pub. Serv. Comm'n of Md.,* 400 Md. 1, 21 (2007) (citations omitted). Upon review of the grant of a motion to dismiss, appellate courts "must determine whether the [c]omplaint, *on its face*, discloses a legally sufficient cause of action." *Pittway Corp. v. Collins,* 409 Md. 218, 234 (2009) (emphasis in original). We "presume[] the truth of all well-pleaded facts in the [c]omplaint, along with any reasonable inferences derived therefrom in a light most favorable to plaintiffs." *Id.* (citation omitted). Additionally, "[i]t is well established in Maryland that, in an appeal from a final judgment, the appellate court may affirm the court's decision on any ground adequately shown by the record." *Norman,* 192 Md. App. at 419 (citations omitted). Therefore, "dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the

---

[2] Appellant consented to the dismissal of the UMS prior to the court's ruling on appellees' motion, leaving UMES and Dr. Keane-Dawes as defendants.

- 4 -

plaintiff." *Litz v. Maryland Dept. of Env't*, 434 Md. 623, 639 (2013) (quoting *Arfaa v. Martino,* 404 Md. 364, 380–81 (2008) (citations omitted).

**DISCUSSION**

Appellant avers that the circuit court erred in granting appellees' motion to dismiss and dismissing her wrongful termination claim. She maintains that she was terminated by appellees for refusing to recruit students using Title III funds. In response, appellees' contend that appellant failed to establish that her termination violated a clear mandate of public policy.

Generally, at-will employment may be terminated by the employee or employer at any time for any reason. *Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md. App. 470, 494 (1995). However, the tort of wrongful discharge is a narrow exception, defined as "the willful termination of employment by the employer because of the employee's alleged failure to perform in accordance with the employer's expectations and the termination is contrary to a clear mandate of public policy." *Id.* at 495 (quoting *Allen v. Bethlehem Steel Corp.,* 76 Md. App. 642, 652 (1988)). An employee must establish the following three elements to assert a claim for wrongful termination: "(1) that the employee was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire the employee." *Sears, Roebuck & Co. v. Wholey*, 139 Md. App. 642, 649 (2001) (quoting *Shapiro v. Massengill*, 105 Md. App. 743, 764 (1995) (citation omitted)). "When a plaintiff fails to demonstrate that his or her grievance is anything more than a private dispute regarding the employer's execution

of normal management operating procedures, there is no cause of action for [wrongful] discharge." *Id.* at 650 (quoting *Lee v. Denro*, 91 Md. App. 822, 833 (1992).

Appellant maintains that pursuant to 20 U.S.C. § 1063b(c), student recruitment is not an authorized expense and that the terms "recruit" or "recruitment" do not appear within the uses as outlined by the statute. However, appellees argue that the limitations provision of 20 U.S.C. § 1062(c), which provides the unauthorized uses for Title III funding, does not prohibit activities related to recruitment. 20 U.S.C. § 1062(c) states:

**(1)** No grant may be made under this chapter for any educational program, activity, or service related to sectarian instruction or religious worship, or provided by a school or department of divinity. . . .

**(2)** Not more than 50 percent of the allotment of any institution may be available for the purpose of constructing or maintaining a classroom, library, laboratory, or other instructional facility.

According to 20 U.S.C. § 1063b(c), Title III funds may be used for:

**(1)** purchase, rental or lease of scientific or laboratory equipment for educational purposes, including instructional and research purposes;

**(2)** construction, maintenance, renovation, and improvement in classroom, library, laboratory, and other instructional facilities, including purchase or rental of telecommunications technology equipment or services;

**(3)** purchase of library books, periodicals, technical and other scientific journals, microfilm, microfiche, and other educational materials, including telecommunications program materials;

**(4)** scholarships, fellowships, and other financial assistance for needy graduate and professional students to permit the enrollment of the students in and completion of the doctoral degree in medicine, dentistry, pharmacy, veterinary medicine, law, and the doctorate degree in the physical or natural sciences, engineering, mathematics, or other scientific disciplines in which African Americans are underrepresented;

**(5)** establishing or improving a development office to strengthen and increase contributions from alumni and the private sector;

**(6)** assisting in the establishment or maintenance of an institutional endowment to facilitate financial independence pursuant to section 1065 of this title;

**(7)** funds and administrative management, and the acquisition of equipment, including software, for use in strengthening funds management and management information systems;

**(8)** acquisition of real property that is adjacent to the campus in connection with the construction, renovation, or addition to or improvement of campus facilities;

**(9)** education or financial information designed to improve the financial literacy and economic literacy of students or the students' families, especially with regard to student indebtedness and student assistance programs under subchapter IV of this chapter and part C of subchapter I of chapter 34 of Title 42;

**(10)** services necessary for the implementation of projects or activities that are described in the grant application and that are approved, in advance, by the Secretary, except that not more than two percent of the grant amount may be used for this purpose;

**(11)** tutoring, counseling, and student service programs designed to improve academic success; and

**(12)** other activities proposed in the application submitted under subsection (d) that—

> **(A)** contribute to carrying out the purposes of this part; and

> **(B)** are approved by the Secretary as part of the review and acceptance of such application.

Congress enacted Title III, in pertinent part, for the purpose of:

> [F]inancial assistance to establish or strengthen the physical plants, financial management, academic resources, and endowments of the historically Black colleges and universities are appropriate methods to enhance these

institutions and facilitate a decrease in reliance on governmental financial support and to encourage reliance on endowments and private sources.

20 U.S.C. § 1060(4).

We agree that the limitations provision does not expressly indicate that recruitment activities would constitute an unauthorized use of Title III funds. Congress provided prohibited uses of the funds, but recruitment activities were not within those prohibitions. Title III was created to provide historically Black colleges and universities with federal financial assistance to strengthen the facilities and contribute to academic resources. Maryland cases which have recognized a violation of a clear mandate of public policy, as implicated in the termination of employment, included, "a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct (or contemplated conduct) in question, so as to make the Maryland public policy on the topic not a matter of judicial conjecture or even interpretation." *Wholey*, 139 Md. App. at 661. Based on the record before us and the review of Title III, appellant has not demonstrated such a violation.

Assuming, *arguendo*, that Title III does not express a clear mandate of public policy, appellant asserts that we should consider an exception based on appellees' earlier belief that the law prohibited allocating Title III funds for recruitment. We disagree.

Maryland courts have not addressed the specific factual issues advanced by appellant's contentions, however the Fourth and Third Circuits have. In *Adler v. American Standard Corp.*, 830 F.2d 1303, 1303 (1987), the Fourth Circuit applied Maryland law and held that, "an employment termination motivated by a desire to conceal wrongdoing by

preventing its disclosure to higher corporate officers does not violate Maryland's public policy." *Id.* at 1304. The appellee, Gerald F. Alder, alleged that he was wrongfully terminated by the appellant, American Standard, Inc. ("ASI"), because he intended to tell higher officers of the corporation that an alleged illegal "kickback" scheme existed. *Id.* at 1304-05. Following the Court of Appeals decision, Alder filed an amended complaint asserting that he was terminated because he intended to report wrongful acts of his supervisors to higher authority. *Id.* at 1306. Alder maintained that his discharge was because his supervisors were aware of the alleged illegal activities and therefore, wanted to keep them concealed. *Id.*

The Fourth Circuit acknowledged that the Court of Appeals of Maryland recognizes an exception to the doctrine of employment at-will, which "permits a claim for abusive discharge when the employee is terminated for reasons which contravene a clear expression of Maryland's public policy." *Id.* at 1304. However, the court stated that this exception was not a broad one and that courts should exercise care in creating new public policy. *Id.* at 1306. It then cited the Court of Appeals decision, which stated:

> We have always been aware, however, that recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch.

*Adler v. Am. Standard Corp.,* 830 F.2d 1303, 1306 (4th Cir. 1987) (quoting *Adler v. Am. Standard Corp.*, 291 Md. 31, 45 (1981). Thereafter, the Fourth Circuit concluded:

> Limitation of the claim for abusive discharge to situations involving the actual refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty, ties abusive discharge claims down to a manageable and clear standard. This analysis is consonant with the stated

intention of the Maryland Court of Appeals in *Adler* to preserve the rights of the employer to terminate employees at will, subject only to the limited exceptions created by statute and to the relatively limited instances where a clear mandate of public policy has been violated. . . . In the absence of a clear declaration by a legislature or the Maryland Court of Appeals that an action for abusive discharge should be extended to situations where the discharged employee claims to have had the knowledge and the intent to report wrongdoing to a higher corporate official, this court should not create such a ruling. We find that the district court erred in determining that the plaintiff had properly stated and proved a cause of action for abusive discharge under Maryland law.

*Id.* at 1307.

In *Clark v. Modern Group*, 9 F.3d 321, 323 (1993), an employee sued his employer for wrongful discharge alleging that he was discharged for refusing to report auto expense reimbursements as taxable income. The Third Circuit applied Pennsylvania law, which is similar to Maryland and provides, "an employer may terminate an at-will employee with or without justification unless the reason for the discharge offends a clear mandate of public policy." *Id.* The employee asked the court to "hold that Pennsylvania's public policy exception to the at-will doctrine extends to cases in which an employee 'reasonably believes' that his employer has requested him to perform an unlawful act and is discharged for objecting to the proposal he believes is unlawful." *Id.* The court noted that the public policy exception to the doctrine of employment at-will was created to protect "society from public harm" and not the employee. *Id.* at 331-32. Further, the court stated:

If an employee can avoid discipline whenever he reasonably believes his employer is acting unlawfully, it is the employee, not the public, who is protected by the good intentions. A company acting within the law is presumed to pose no threat to the public at large. The creation of a cause of action based on an employee's reasonable belief about the law would leave a private employer free to act only at the sufferance of its employees

whenever reasonable men or women can differ about the meaning or application of a law governing the action the employer proposes.

*Id.* at 332. Therefore, the court concluded that a clear violation of public policy depends on an actual violation of law. *Id.*

The employee cited to no authority which indicated that an employer who discharges an employee because of the employee's refusal to perform an act, which they both incorrectly believe is unlawful, is liable for wrongful discharge in the absence of a violation of public policy. *Id.* Therefore, the court concluded:

> Under existing case law, we conclude that Pennsylvania will not allow recovery for wrongful discharge based only on a showing that an employer faced with ambiguous law was willing to engage in a course of conduct it wanted to pursue without regard to its legality.
>
> * * *
>
> For all these reasons, we predict the Pennsylvania Supreme Court would not recognize a cause of action for wrongful discharge based either on an employee's reasonable belief that the employer's act is unlawful or an employer's belief that the act the employee objects to is unlawful, unless the act proposed is in fact unlawful or the motive for the discharge is illegal invidious discrimination.

*Id.* at 333.

Unlike appellees, appellant has not cited any authority to support her contentions. The public policy exception is a narrow one that should be exercised sparingly. Before making its ruling, the court stated:

> The second element involves a threshold legal determination for the [c]ourt. And in that regard we find that the amended complaint lacks any reference to any Federal, Statutory, or Regulatory language expressly stating that recruitment activities are prohibited use under the Title III funds.
> An examination of Title III reveals that nowhere does such an expressed probation exist. In fact Title III contains provisions enumerating

- 11 -

the limitations on the use of funds and the recruitment activities is not among them. The Department of Education implementing regulations also lack any such prohibition.

And we find that since Title III of the Federal Higher Education Act lacks any expressed prohibition against the use of funds for recruiting activities [appellant has] failed to satisfy [the] professional element to her wrongful termination claim that her termination violates a clear mandate of public policy.

And we also find that the motion to dismiss is an appropriate motion and we grant it.

We agree. Appellant's complaint did not demonstrate a legally sufficient cause of action. There was no clear mandate of public policy nor an appropriate exception. Accordingly, the circuit court was legally correct in its decision to grant appellees' motion to dismiss.

**JUDGMENT OF THE CIRCUIT COURT FOR SOMERSET COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**